**Filed: June 14, 2012**

IN THE SUPREME COURT OF THE STATE OF OREGON

JACK DOE 1, an individual
proceeding under a fictitious name;
JACK DOE 2, an individual
proceeding under a fictitious name;
JACK DOE 3, an individual
proceeding under a fictitious name;
JACK DOE 4, an individual
proceeding under a fictitious name;
JACK DOE 5, an individual
proceeding under a fictitious name;
JACK DOE 6, an individual
proceeding under a fictitious name,

          Plaintiffs,

    v.

CORPORATION OF THE PRESIDING
BISHOP OF THE CHURCH OF JESUS
CHRIST OF LATTER-DAY SAINTS,
a foreign corporation solely registered to do
business in the State of Oregon; and
CORPORATION OF THE PRESIDENT OF
THE CHURCH OF JESUS CHRIST OF
LATTER-DAY SAINTS AND SUCCESSORS
a foreign corporation solely registered to do
business in the State of Oregon,

          Defendants,

    and

THE BOY SCOUTS OF AMERICA,
a congressionally chartered corporation,
authorized to do business in Oregon;
and CASCADE PACIFIC COUNCIL,
BOY SCOUTS OF AMERICA,
an Oregon non-profit corporation,

          Defendants-Adverse Parties,

    and

THE ASSOCIATED PRESS,
THE OREGONIAN,

OREGON PUBLIC BROADCASTING,
THE NEW YORK TIMES, KGW,
and COURTHOUSE NEWS SERVICE,

Intervenors-Relators.

S058601 (Control)

JACK DOE 1, an individual
proceeding under a fictitious name;
JACK DOE 2, an individual
proceeding under a fictitious name;
JACK DOE 3, an individual
proceeding under a fictitious name;
JACK DOE 4, an individual
proceeding under a fictitious name;
JACK DOE 5, an individual
proceeding under a fictitious name;
JACK DOE 6, an individual
proceeding under a fictitious name,

Plaintiffs,

v.

CORPORATION OF THE PRESIDING
BISHOP OF THE CHURCH OF JESUS
CHRIST OF LATTER-DAY SAINTS,
a foreign corporation solely registered to do
business in the State of Oregon;
CORPORATION OF THE PRESIDENT
OF THE CHURCH OF JESUS CHRIST
OF LATTER-DAY SAINTS AND SUCCESSORS,
a foreign corporation solely registered to do business
in the State of Oregon; and CASCADE PACIFIC
COUNCIL, BOY SCOUTS OF AMERICA,
an Oregon non-profit corporation

Defendants,

and

THE BOY SCOUTS OF AMERICA,
a congressionally chartered corporation,
authorized to do business in Oregon,

Defendant-Relator,

and

THE ASSOCIATED PRESS,
THE OREGONIAN,
OREGON PUBLIC BROADCASTING,
THE NEW YORK TIMES, KGW,
and COURTHOUSE NEWS SERVICE,

Intervenors-Adverse Parties.

S058634

En Banc

Original proceeding in mandamus.

Argued and submitted January 11, 2011.

Charles F. Hinkle, Stoel Rives LLP, Portland, argued the cause and filed the briefs for Intervenors-Relators/Intervenors-Adverse Parties The Associated Press, The Oregonian, Oregon Public Broadcasting, The New York Times, KGW, and Courthouse News Service.

Robert L. Aldisert, Perkins Coie LLP, Portland, argued the cause and filed the briefs for Defendants-Relators/Defendants-Adverse Parties The Boy Scouts of America.

Lori Irish Bauman, Ater Wynne LLP, Portland, filed the brief for *amicus curiae* TechAmerica. With her on the brief was Frank V. Langfitt.

Erin K. Olson, Portland, filed the brief for *amici curiae* National Center for Victims of Crime, Survivors Network of Those Abused by Priests, Jewish Board of Advocates for Children, Inc., Child Protection Project, Child Victims Voice, Oregon Abuse Advocates and Survivors in Service, Oregon Anti-Crime Alliance, Crime Victims United, and Oregon Trial Lawyers Association. With her on the brief was Marci A. Hamilton, Washington Crossing, Pennsylvania.

Denise G. Fjordbeck, Attorney-in-Charge, Salem, filed the brief for *amicus curiae* State of Oregon.

DURHAM, J.

The alternative writs of mandamus are dismissed.

DURHAM, J.

These opposing petitions for writs of mandamus challenge a trial court order allowing the release, to the press and to the public, of redacted versions of 1,247 "ineligible volunteer" files belonging to defendant Boy Scouts of America (BSA). Those files contain information regarding child sexual abuse complaints against BSA volunteers from 1965 to 1985. The trial court had admitted the files, and BSA's actions in response to those complaints, into evidence in the jury trial of the matter below. To decide these mandamus petitions, we must examine the contours of the "open courts" clause of Article I, section 10, of the Oregon Constitution. That clause provides, in part:

"No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay[.]"

For the following reasons, we dismiss both writs.

These mandamus petitions arise out of a tort action brought against the Church of Jesus Christ of Latter-Day Saints and the BSA by six former Boy Scouts who alleged sexual abuse by their scout leaders.[1] One of those former scouts, Lewis, severed his claims from the other plaintiffs' claims and the matter proceeded to trial. During pretrial discovery, plaintiffs requested that BSA produce its ineligible volunteer files. After BSA objected, plaintiffs moved to compel production of the files. The trial court granted plaintiffs' motion to compel and ordered BSA to produce all unredacted ineligible volunteer files covering the period 1965 to 1985, subject to a protective order. The protective order required the parties to keep the files confidential and prohibited

---

[1] Plaintiffs settled their claims against the Latter-Day Saints defendants prior to trial.

1

distribution of the files. The order also required that all copies be returned to BSA within 90 days after a judgment or order terminating the action.

The trial court conducted a bifurcated trial of Lewis's claims. During phase one, the jury heard evidence related to liability, compensatory damages, and liability for punitive damages. During that phase, Lewis offered all 1,247 files into evidence, each file as a separate exhibit. Each file apparently contains information related to one alleged perpetrator of abuse, not one act of abuse and not one victim of abuse. The court received each file into evidence, over BSA's objections. Lewis discussed many of the ineligible volunteer files in the presence of the jury during trial, and all files accompanied the jury into the jury room for consideration during deliberations. At the conclusion of phase one, the jury awarded compensatory damages in the amount of $1.4 million and found BSA liable to Lewis for punitive damages. At the conclusion of phase two, the jury returned a verdict of over $18 million in punitive damages.[2] After trial, the trial court entered another protective order, continuing the restrictions of its previous protective order until further order of the court.

Following the verdict, plaintiffs moved to vacate the protective order so that they could release the ineligible volunteer files to the public. Previously six media entities[3] had moved to intervene and also asked the trial court to release the trial exhibits, including the 1,247 ineligible volunteer files, for immediate public access. The trial court

---

[2] BSA and plaintiffs report that they settled the action after filing these mandamus petitions. The details of the settlement play no role in our decision here.

[3] Those entities are The Associated Press, The Oregonian, Oregon Public Broadcasting, KGW, The New York Times, and Courthouse News Service. In this opinion, we refer to these media entities collectively as "intervenors."

heard those motions together.

In an opinion and order dated June 18, 2010, the trial court granted plaintiffs' motion to vacate the protective order and granted intervenors' motion to release the trial exhibits, subject to two conditions: (1) "redaction of the names of the victims and those who reported alleged abuse"; and (2) a "stay in the effectiveness of this Order pending appellate review." The trial court concluded that Article I, section 10, required the release of the ineligible volunteer files, reasoning that Article I, section 10, encompassed "the right of the public and the press to know what evidence is presented in Court proceedings and is available for consideration by the jury in reaching its verdict." The trial court accorded significance to the differences between Oregon's open courts clause and the open courts clause of Indiana, upon which Oregon's clause was based: "Th[e] strengthening of the language clearly evidences the intent of the framers to have public access be the hallmark of Oregon's court system."

The trial court also addressed defendants' separate argument that, if Article I, section 10, did not compel the court to provide public access to the disputed files, then the question of public access to trial exhibits was a matter governed by the trial court's discretion. The trial court determined that it was appropriate for the court to consider how it would exercise any available discretion regarding the possible release of exhibits in the event that a reviewing court determined that Article I, section 10, did not require the court to grant access to the files.

The court considered an array of factors that the parties offered to influence the court's discretionary choices. The court stated:

"Defendants cite the following factors that support Defendants'

3

claim that the Court should exercise its discretion to deny the motions: Prejudice to Defendants in terms of the opportunity of Defendants to receive a fair trial of the remaining cases; prejudice to third parties, in particular victims of sexual abuse who wish to remain anonymous; prejudice to alleged perpetrators considering that the exhibits do not exist only on account of criminal convictions or other adjudications of responsibility by the individuals who are the subject of the files; the lack of prejudice to the remaining Plaintiffs; and the salutary effect assurances of confidentiality have on the willingness of individuals to report alleged abuse.

"Plaintiffs and Amici respond that lifting the veil of secrecy on child sexual abuse is the primary method by which the child sexual abuse problem in our society will be reduced, minimized, or hopefully eradicated. Plaintiffs and Amici support redaction of the names of the alleged victims. Plaintiffs also support the redaction of the names of those who reported the alleged abuse. Intervenors claim the right to the unredacted files in the form they were received into evidence."

The court then explained how it would exercise its discretion to release the files in a redacted form if the constitution did not require release of the files in an unredacted form:

"Considering the factors noted above, the Court concludes that if Article I, Section 10 of the Oregon Constitution does not require the Court to grant the motions, the Court would nevertheless exercise its discretion to do so, in a manner as qualified below. I come to this conclusion considering fully and carefully the claims of Defendants and the assertions of Plaintiffs and Amici, cited above.

"Despite the Court's conclusions noted above about the Constitutional requirements, I conclude, as urged by Plaintiffs and to some degree by Amici, that in the exercise of the Court's inherent power to control its proceedings, the protection of alleged child sexual abuse victims and the reasonable expectations of those who reported alleged child [sexual] abuse require that any release of these files be a qualified release, that is, with the names of all victims and the names of those who reported abuse redacted."

The court stayed the effectiveness of its order so that the status quo would be maintained while the parties and intervenors sought relief in this court.

Soon thereafter, intervenors filed a mandamus petition in this court, asking this court to order the trial court immediately to release the ineligible volunteer files, in their unredacted form, for public inspection. BSA opposed intervenors' petition and filed its own petition challenging the trial court's decision to vacate the protective order and release the ineligible volunteer files at all. The matters were consolidated, and this court issued alternative writs of mandamus in both matters.

Intervenors argue that the trial court's decision to redact the ineligible volunteer files and to delay the files' release until after appellate review violated Article I, section 10. Intervenors contend that Article I, section 10, requires public access to trial exhibits and affords the trial court no discretion in deciding whether to allow the public to review that evidence in full. According to intervenors, Article I, section 10, requires that all documentary evidence reviewed by the trier of fact must be available to the public in exactly in the same form as that reviewed by the trier of fact. Intervenors also argue that Article I, section 10, requires *immediate* public access and, therefore, the trial court's decision to stay its order releasing the files pending appellate review also violates Article I, section 10. Intervenors ask this court to issue a peremptory writ of mandamus directing the trial court to make the unredacted ineligible volunteer files immediately available for public inspection.

BSA contends, in its own mandamus petition, that the trial court erred in vacating the protective order because Article I, section 10, does not create a public right to obtain evidence. Instead, BSA argues, Article I, section 10, concerns only the public's right to attend judicial proceedings. BSA argues that a review of the text of the provision, its history, and case law interpreting the provision supports its interpretation of

5

Article I, section 10.[4] BSA also argues that the trial court abused its discretion in releasing the ineligible volunteer files because the trial court failed to consider BSA's evidence about the repercussions of releasing the files. For those reasons, BSA urges this court to issue a peremptory writ of mandamus directing the court to vacate its order releasing the ineligible volunteer files.

Mandamus is an extraordinary remedy, used to enforce a clear legal right. *State v. Burleson*, 342 Or 697, 701, 160 P3d 624 (2007). A writ of mandamus "shall not control judicial discretion." ORS 34.110. Mandamus may be appropriate, however, where the trial court's action falls outside the "permissible range of discretionary choices open to [it]." *Burleson*, 342 Or at 702.

We address BSA's mandamus petition first. BSA contends that Article I, section 10, does not create a right of access to trial exhibits. Applying the methodology set forth in *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992), BSA analyzes the text of the constitutional provision, the historical circumstances leading to its adoption, and the case law interpreting the provision. According to BSA, that analysis mandates the conclusion that Article I, section 10, requires open court proceedings but does not require access to trial evidence. As outlined above, BSA also argues, in the alternative, that the trial court had discretion to decide whether to release the exhibits but abused its discretion by granting intervenors' motion to vacate the protective order, thereby releasing the ineligible volunteer files, albeit in a redacted form, to the public.

---

[4] The Attorney General, appearing as *amicus curiae*, agrees with BSA that the text, history, and case law indicate that Article I, section 10, refers only to in-court proceedings and that Article I, section 10, includes no public right to obtain trial evidence.

As we discuss later in this opinion, we agree that Article I, section 10, does not compel the trial court to release to the public trial exhibits that are subject to a protective order or entitle the public to have access to trial exhibits at the close of trial. We also assume the correctness of defendants' alternative contention that, if a right to inspect exhibits exists, then the trial court has discretion to determine the conditions for the release of the exhibits for public inspection.[5] However, contrary to defendants' contentions, we do not agree that the trial court abused its discretion in this case when it vacated its earlier protective order and required release of the exhibits in a redacted form.

To begin, we find nothing in Article I, section 10 -- and BSA points to nothing -- that *prohibits* the trial court from releasing the ineligible volunteer files to the public. Neither does BSA point to any statute or other authority that prohibited the trial court from vacating its own protective order and releasing the ineligible volunteer files. The issuance and vacation of protective orders are matters of a trial court's discretion. *See* ORCP 36 C (granting court discretion to make any discovery order "which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense").

BSA nevertheless argues that the trial court's order was an "abdication of its duty to administer justice and contrary to reason." BSA asserts that the trial court failed to give reasons for its decision and disregarded the public policies that would be undermined by releasing the ineligible volunteer files. BSA contends that it presented evidence regarding the effect of the release of the ineligible volunteer files on the alleged

---

[5]     This court adopted a similar assumption in *State ex rel KOIN-TV v. Olsen*, 300 Or 392, 711 P2d 966 (1985), which we discuss in greater detail later in this opinion.

victims named in the files and that the trial court "ignored" that evidence. The trial court's decision to redact the names of the alleged victims, however, belies BSA's assertion that the trial court "ignored" that evidence. BSA also argues that the trial court failed to give proper weight to its arguments about the effect of the files' release on BSA's ability to defend itself in pending cases. We disagree. The trial court considered that argument and rejected it, stating, "The problem with this argument by [BSA] is that it is speculation, with nothing concrete to support it other than its bare assertions." In short, BSA has not demonstrated that the trial court's decision to vacate the protective order and release the ineligible volunteer files was an abuse of discretion. BSA thus has failed to show that it is clearly entitled to the mandamus remedy it seeks. We therefore dismiss the alternative writ issued in response to BSA's mandamus petition.

We now turn to intervenors' mandamus petition. As stated earlier, intervenors argue that Article I, section 10, required the trial court to release unredacted ineligible volunteer files, in the same form as they were admitted as exhibits at trial. To resolve intervenors' petition, therefore, we must decide whether Article I, section 10, requires the court, at the end of a trial and upon request, to release for inspection documents received in evidence and considered by the jury.

We interpret a constitutional provision by examining the text of the provision, the historical circumstances leading to the creation and adoption of the provision, and the applicable case law concerning the provision. *Clarke v. OHSU*, 343 Or 581, 590, 175 P3d 418 (2007) (citing *Priest*, 314 Or at 415-16). In that process of interpretation, we attempt to understand the provision, if possible, as the framers would have understood it. We then apply the constitutional principles that we discern from our

8

inquiry to modern circumstances as they arise.  *See Smothers v. Gresham Transfer, Inc.,* 332 Or 83, 90-91, 23 P3d 333 (2001).

Article I, section 10, provides:

"No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property, or reputation."

Within Article I, section 10, are two independent clauses.  *Smothers*, 332 Or at 91.  We are concerned with the first independent clause of Article I, section 10, the so-called "open courts" clause, which states:  "No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay[.]"  We have explained that "[t]he first clause of Article I, section 10, * * * prescribes how justice must be administered in Oregon by identifying both a prohibition (no court shall be secret) and a directive (justice must be administered openly, completely, and without purchase or delay)."  *Smothers*, 332 Or at 91.  Within that first clause, two phrases are particularly pertinent here:  (1) "[n]o court shall be secret," and (2) "justice shall be administered, openly."  For the purpose of our inquiry, the key terms in the open courts clause are "court," "secret," and "openly."  We begin our textual inquiry by considering the ordinary meaning of those terms, as the framers would have understood them, including, as appropriate, any pertinent definitions that may have appeared in contemporaneous dictionaries.  *See Smothers*, 332 Or at 92 (citing contemporaneous standard and law dictionaries to interpret remedy clause of Article I, section 10).

The first phrase of the open courts clause states:  "No court shall be secret." The term "court" appears in several passages of the Oregon Constitution, either by itself,

as in Article I, section 10, or as part of the phrase "Court of Justice."  *See, e.g.*, Or Const, Art I, § 6 ("No person shall * * * be questioned in any Court of Justice touching his religeous [sic] belief to affect the weight of his testimony.");  Or Const, Art I, § 11 (in criminal prosecution, the accused "may elect to waive trial by jury and consent to be tried by the judge of the court alone"); Or Const, Art I, § 44(1)(a) (term of imprisonment imposed "by a judge in open court may not be set aside or otherwise not carried out" subject to stated exceptions).  The constitution addresses some of those references, either expressly or by implication, to specific courts within the judicial branch of the government.  Or Const, Art I, § 11 ("[I]n the circuit court ten members of the jury may render a verdict * * *."); Or Const, Art 1, § 42 (identifying rights of victims in "criminal and juvenile court delinquency proceedings"); Or Const, Art VII (Amended), § 1 ("The judicial power of the state shall be vested in one supreme court and in such other courts as may from time to time be created by law.").

Despite the slight variations in usages noted above, the term "court" in the Oregon Constitution refers to a legally established institution designed and authorized to administer justice.  A dictionary, in wide use in 1859, confirms that the framers likely understood a "court" to consist of both the place where that institution administers justice as well as the judges and other persons who are charged by law with the administration of justice.  Noah Webster, 1 *An American Dictionary of the English Language* (1828) (reprint 1970) defines "court," as pertinent, in this way:

> "4. The hall, chamber or place where justice is administered. * * * 6. The persons or judges assembled for hearing and deciding causes, civil, criminal, military, naval or ecclesiastical; as a *court* of law * * * .  Hence, 7. Any jurisdiction, civil, military or ecclesiastical."

10

(Emphasis in original.)

A legal dictionary, also in use contemporaneously with adoption of the Oregon Constitution, defines "court" by drawing attention to the importance of the presence of judges and their subordinate clerical staff in the place identified as a court, as well as their performance of the functions of a court in the administration of justice. According to John Bouvier, 1 *A Law Dictionary Adapted to the Constitution and Laws of the United States of America* 246-47 (1839) (2d reprint 2000):

> "[A] court is an incorporeal political being, which requires for its existence, the presence of judges, or a competent number of them, and a clerk or prothonotary, at the time during which, and at the place where it is by law authorised to be held; and the performance of some public act, indicative of a design to perform the functions of a court. In another sense, the judges, clerk or prothonotary, counsellors and ministerial officers, are said to constitute the court. According to Lord Coke, a court is a place where justice is judicially administered. The judges alone, are also called the court[.]"

(Citations omitted.)

Those definitions indicate that, within the meaning of Article I, section 10, a "court" is a governmental institution, composed of judges and their supporting staff, whom the law charges with the responsibility to administer justice. This court, in describing that institution, has stated that "[t]he fundamental function of courts is to determine legal rights based upon a presentation of evidence and argument." *Oregonian Publishing Co. v. O'Leary*, 303 Or 297, 303, 736 P2d 173 (1987). Our cases uniformly have applied the "open courts" provision to the circuit courts of this state. *See, e.g.*, *id.* at 305 (Article I, section 10, prohibits circuit court from closing criminal trial to receive witness testimony in private); *State ex rel Oregonian Pub. Co. v. Deiz,* 289 Or 277, 613 P2d 23 (1980) ("open court" clause of Article I, section 10, prohibits a circuit court judge

11

from barring the press from attending a juvenile court proceeding). We do so here as well.

We consider the meanings of the constitutional terms "secret" and "openly" together, because they address the same concept. A contemporaneous standard dictionary defines the term "secret" as "[p]roperly, separate; hence, hid; concealed from the notice or knowledge of all persons except the individual or individuals concerned" and "unseen; private; secluded; being in retirement." Webster, 2 *An American Dictionary* at 66. Not surprisingly, the dictionary defines "openly" as the opposite of secret: "[p]ublicly; not in private; without secrecy." *Id.* at 26. Those definitions, considered in the context of Oregon's judicial system, confirm that Oregon's framers sought to require the courts to conduct the business of administering justice in public -- that is, in a manner that permits public scrutiny of the court's work in determining legal controversies. *See* David Schuman, *Oregon's Remedy Guarantee: Article I, Section 10 of the Oregon Constitution*, 65 Or L Rev 35, 38 (1986) (hereafter Schuman) ("Oregon evidently took 'open' to mean 'non-secret' or 'accessible to scrutiny,' instead of 'non-exclusive' or 'accessible to all regardless of ability to pay.'").

Without question, the first phrase of the open courts clause of Article I, section 10, focuses explicitly on the court as the institution that administers justice and prohibits that institution from concealing the administration of justice from public view. The second phrase, "justice shall be administered, openly," similarly mandates the publicly visible and audible administration of justice. As we discuss below, our cases have recognized that the command for openness in Article I, section 10, is subject to qualification for some aspects of court proceedings that, by well-established tradition,

12

were and are conducted out of public view, as long as the framers intended the tradition of secrecy as to those proceedings to persist despite adoption of Article I, section 10. *O'Leary*, 303 Or at 304 (discussing nonpublic jury deliberations and collegial court conferences). The problem that we face is that, despite the phrasing of Article I, section 10, and the historical exceptions to that provision recognized in our cases, the constitutional text furnishes no explicit answer to intervenors' claim of a right to obtain the release of trial exhibits that a jury considered during its deliberations.

We turn next to the historical circumstances surrounding the adoption of the open courts clause. The probable source for the open courts clause is Chapter 40 of the Magna Carta. *See id.* at 301 n 3 ("The probable genesis of section 10 was Article 40 of the Magna Carta[.]" (citation omitted)). Translated, Chapter 40 provides, "To no one will we sell, to no one will we deny, or delay, right or justice." *Id.* (citation omitted). In his *Second Institutes*, Lord Coke commented on and interpreted Chapter 29 of the Magna Carta of 1225, which previously had appeared as Chapters 39 and 40 of the Magna Carta of 1215. *Smothers*, 332 Or at 94-95. Coke's commentary provided the basis for the open courts clause of many state constitutions, including the Oregon Constitution. *O'Leary*, 303 Or at 301 n 3. Lord Coke wrote:

> "And therefore every subject of this realme [*sic*], for injury done to him in [goods, lands, or person], by any other Subject, be he ecclesiastical, or temporall [*sic*], free, or bond, man, or woman, old, or young, or be he outlawed, excommunicated, or any other without exception, may take his remedy by the course of the law, and have justice and right for the injury done him, freely without sale, fully without any deniall [*sic*], and speedily without delay."

Edward Coke, 1 *The Second Part of the Institutes of the Laws of England,* 55 (1797).

Lord Coke's commentary on Chapter 29 was apparently motivated by a desire to combat

13

judicial abuses, such as the sale, delay, and denial of common-law justice through corruption and interference by the King or his ministers. Coke advocated that each person have access to courts to obtain a remedy by due course of law, with assurance that the king would not sell, deny, or delay justice. *Smothers*, 332 Or at 96-97.

The desire for judicial impartiality and independence also apparently motivated the early American adoption of open courts clauses, which were based on Lord Coke's interpretation. Because Coke's concerns focused on access to courts, the mandate that courts be "open" in early American state constitutions generally may have referred to access to courts by litigants, not necessarily to a court's secrecy or its susceptibility to public scrutiny, as it has been understood more recently. *O'Leary*, 303 Or at 301 n 3; Schuman, 65 Or L Rev at 38. One early American constitution, the Pennsylvania Constitution, echoed Coke's phrasing and provided, "That all courts shall be open, and every man, for an injury done him in his lands, goods, person, or reputation, shall have remedy by the due course of law, and right and justice administered without sale, denial or delay." Pa Const, Art 9, § 11 (1790); *O'Leary*, 303 Or at 301 n 3 (internal quotation marks and citation omitted).

Indiana adopted similar language in Article I, section 12, of its 1851 constitution, upon which Oregon's open courts clause is based: "All courts shall be open; and every man, for injury done to him in his person, property, or reputation, shall have remedy by due course of law. Justice shall be administered freely, and without purchase; completely, and without denial; speedily, and without delay." The framers of the Oregon Constitution rephrased the Indiana provision, however, to state that "[*n*]*o* court shall be

14

*secret*,"[6] and add that "justice shall be administered, *openly*." Or Const, Art I, § 10 (emphasis added). We agree with the trial court that those changes in wording from the Indiana provision carry meaning. It appears clear to us that the framers of the Oregon Constitution were concerned with access to Oregon courts by its citizens, as might be assumed based on the historical origins of the clause, and were concerned equally with combating secrecy in the administration of justice and fostering judicial accountability through public scrutiny of court proceedings. The open courts clause of the Oregon Constitution thus protects both a litigant's access to court to obtain legal redress and the right of members of the public to scrutinize the court's administration of justice by seeing and hearing the courts in operation.

The historical circumstances that led to the adoption of Oregon's open courts provision, like the text of the Article I, section 10, itself, do not provide a clear answer to the issue posed in this case. The parties, however, rely on three cases from this court interpreting Article I, section 10, to support their competing positions. We turn next to a consideration of those cases.

In *Deiz*, a newspaper and its reporter sought court permission to attend a controversial juvenile court proceeding. The trial judge barred the press from the courtroom, relying on a statute that authorized exclusion of the general public from juvenile proceedings unless the judge determined that a particular person had "a proper

---

[6] The first draft of Article I, section 10, used the word, "tribunal," instead of "court." Claudia Burton and Andrew Grade, *A Legislative History of the Oregon Constitution of 1857 -- Part I (Articles I & II)*, 37 Willamette L Rev 469, 516 (2001). The subsequent versions used the word "court." *Id.* The reasons for the change are unknown, and no debate took place regarding this clause. *Id.* That change does not affect our analysis of the open courts clause in this case.

interest in the case or the work of the court." 289 Or at 279 (quoting *former* ORS

419.498(1) (1979), repealed by Or Laws 1993, ch 33, § 373). The company and the

reporter sought relief in mandamus to nullify the exclusion order.

This court first concluded that the trial judge had acted within her statutory

authority in excluding the press. *Id.* at 281 The court then turned to Article I, section 10.

The court noted that Article I, section 10, applies to all judicial proceedings, not

particular categories of proceedings. *Id.* at 283. The court also observed that Article I,

section 10, expresses a principle regarding the open administration of justice for the

benefit of the entire public, and not a mere individual right to an open court that a litigant

in a specific case could waive or fail to assert. *Id.* at 282. The court concluded that the

trial judge's exclusion order violated Article I, section 10. *Id.* at 284.

The court in *Deiz*, however, added that its holding did not create a

constitutional right to attend all judicial proceedings:

"One obvious limitation is that jury deliberations and court
conferences have been and are held in private. We are of the opinion that
despite the absence of any language in Art I, § 10 expressly excluding jury
deliberation from the prohibition against secret deliberations, the tradition
that such proceedings be held in private was so long and so well established
in 1859 that the tradition should be read into the section. The same is true
of conferences of collegial courts."

*Id.* at 284 (citations omitted). The court also stated that the trial court retained authority

to control access to the courtroom by the press or public to prevent overcrowding or

interference with court proceedings. *Id.* at 285.

In a concurring opinion, Justice Linde drew attention to the importance of

public visibility in the administration of justice:

"As the Court's opinion sets forth, Oregon's Constitution guarantees

16

the open and visible administration of justice, not only honest and complete and timely justice, but justice that can be seen to be so during and after the event."

*Id.* at 286 (Linde, J., concurring). Justice Linde noted that the rights of the press and the public under the free expression guarantee in Article I, section 8,[7] and rights of the accused under Article I, section 11,[8] were "guarantees of personal freedom against oppressive governmental power." *Id.* at 288. But Article I, section 10, according to Justice Linde,

"plays a different role. It is one of those provisions of the constitution that prescribe how the functions of government shall be conducted. * * * Here it is the judicial function, that function which brings the law to bear on individuals and puts the generalities of policy to the test of the concrete case."

*Id.*

Justice Linde explained that the constitutional requirement of visibility in the administration of justice was important in the context of both civil and criminal justice. Referring to the function of openness in the administration of criminal justice, Justice Linde stated:

"There it serves to assure accountability for the charge not prosecuted, the reduced plea accepted, *the evidence used or not used*, and particularly to forestall suspicion that political considerations entered a case behind closed

---

[7] Article I, section 8, of the Oregon Constitution provides:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

[8] Article I, section 11, provides, in part:

"In all criminal prosecutions, the accused shall have the right to public trial by an impartial jury in the county in which the offense shall have been committed * * *."

doors."

*Id.* at 289 (emphasis added).

Finally, Justice Linde rejected the view that the open court guarantee deprived judges of the authority, for good cause, to prevent a particular person from attending a court proceeding:

> "It is obvious, for reasons of space alone, that a guarantee of open courts does not guarantee any one person a 'right' to be present. Justice is nonetheless openly administered when one or another person is for good cause prevented from attending."

*Id.* at 290.

In *State ex rel KOIN-TV v. Olsen*, 300 Or 392, 711 P2d 966 (1985), this court addressed whether the operator of a television station was entitled to copy the videotape of a defendant's testimony in a civil case. A party played the videotape as evidence before a jury in open court, marked the videotape as an exhibit, and offered it in evidence. The opposing party stated no objection, and the court received the videotape in evidence. Later, the television station sought a copy of the videotape from the court.

The trial judge denied the request. The judge advanced several reasons for the ruling, which this court summarized as follows:

> "(1) The videotape was not truly an exhibit and had there been objection to its offer in evidence, he would not have admitted it. (2) [Plaintiff's] counsel had agreed in advance of taking the testimony by videotape that the tape would not be disseminated outside the courtroom, and the defendants certainly objected to the copying. (3) An exhibit is not public property; it is the property of the owner. (4) To permit the copying for television broadcasting would have a chilling effect on the use of a valuable tool in moving the court's docket along. (5) There was no statutory right to copy an exhibit."

*Id.* at 409. This court stated that the trial judge's reasons "are not sham or frivolous. He

18

was entirely correct in his assertion that the videotape was not truly an exhibit at all." *Id.*

The television station commenced a mandamus proceeding in this court, seeking to overturn the trial court's refusal to allow the station to copy the videotape. This court began by assuming *arguendo* that state statutes providing for the inspection and copying of public records did not apply to courts, *id.* at 400, and proceeded to determine whether the common law recognized a right of access to exhibits such as the videotape. We consider the court's discussion of the common law in *Olsen* in the context of this constitutional challenge to determine whether a claimed common law right to inspect an exhibit was a part of the administration of justice to which Article I, section 10, applies.

The court in *Olsen* first considered several federal authorities that distinguished between the court's records and files, on the one hand, and trial exhibits, on the other hand. One older case, *Ex parte Drawbaugh*, 2 App DC 404 (1894), acknowledged a common understanding that the public could inspect the court's records and files, according to long-established usage in practice, but that case did not involve the right to copy exhibits. Later federal cases, relying on *Drawbaugh*, concluded that a common law right to copy exhibits existed, but that that right was not absolute and was subject to the discretion of the court. *See United States v. Mitchell*, 551 F2d 1252 (DC Cir 1976) (so holding; trial court abused its discretion in refusing to allow copying of audio tapes). This court, in examining *Mitchell*, observed that much of the legal authority relied on for that proposition did not exist, because the cited decisions did not concern copying exhibits. *Olsen*, 300 Or at 403.

The United States Supreme Court granted certiorari to review that

19

conclusion in *Mitchell* and stated:

> "The few cases that have recognized such a right do agree that the decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case."

*Nixon v. Warner Communications, Inc.*, 435 US 589, 599, 98 S Ct 1306, 55 L Ed 2d 570 (1978). The United States Supreme Court then reversed the lower court decision, concluding, for reasons that are less than clear, that the trial court had not abused its discretion in refusing to release the audiotapes to the media. *Id.* at 608.

In *Olsen*, after reviewing the foregoing federal authorities, this court acknowledged that the Supreme Court's holding in *Nixon* apparently turned on the discretionary authority of the trial court to control access to audiotapes admitted into evidence. This court further noted that even the dissenting opinion of Justice Stevens in *Nixon* had agreed that the trial judge's decision declining to allow the media to copy audiotape exhibits was subject to reversal only for an abuse of discretion. 300 Or at 405.

This court in *Olsen* then cited and quoted two decisions from this court that stated that, at common law, only persons who could show a need for the information could assert a common law right to inspect or make copies of public records. *Id.* at 405-06 (citing *MacEwan v. Holm et al*, 226 Or 27, 35, 359 P2d 413 (1961); *Bend Publishing Co. v. Haner*, 118 Or 105, 107, 244 P 868 (1926)). The court in *Bend Publishing Co.* also concluded that an applicable statute granted the plaintiff a right to inspect and examine the clerk's records for a lawful purpose. 118 Or at 109. The *Olsen* court concluded from those cases that, in view of the narrow common law right to inspect public records, it was "extremely doubtful that this court would have held there to be a

20

common-law right to copy exhibits." 300 Or 406.

To complete its analysis of the claimed right to copy exhibits, the *Olsen* court assumed that a common law right existed to copy exhibits received in evidence during the course of a civil trial. As to that assumed right, the court stated:

"We agree with the *Nixon* decision (and the dissent of Justice Stevens) that the right is not absolute but is subject to the discretion of the trial judge. That being so, in a proceeding in mandamus, we can overrule the trial judge's decision only if we find there to have been an abuse of discretion."

*Id.* at 406-07 (footnote omitted). The court went on to conclude that the decision to deny a copy of the videotape to the television station was not an abuse of discretion. *Id.* at 409.

This court's discussion in *Olsen* concerning Article I, section 10, was brief:

"There is not one iota of evidence in this proceeding to support a finding that the trial in which the videotape was used was 'secret.' KOIN's employees were admitted as were members of the public at large. Justice was administered openly and without purchase."

*Id.* at 410. That holding is significant for our purposes in this case, because the *Olsen* court gave no hint that the constitutional open courts provision granted the television station the right to copy an exhibit that was different from -- or broader than -- the limited common law right, which the court had discussed earlier, to request a copy of an exhibit subject to the sound discretion of the trial judge.

The final case is *O'Leary*, 303 Or 297. In *O'Leary*, the plaintiff, Oregonian Publishing Company, filed a declaratory judgment action challenging, under Article I, section 10, a statute that required a court to hold a hearing "outside the presence of the jury and the public" in criminal or grand jury proceedings where a witness refused to testify on the ground that the witness may be incriminated by the testimony. 303 Or at

299 n 1 (quoting *former* ORS 136.617 (1987, *amended by* Or Laws 1991, ch 724 § 25(a)). This court held that the statute at issue violated Article I, section 10. *Id.* at 299. After reviewing the history and the text, this court explained that the clause "is written in absolute terms; there are no explicit qualifications to its command that justice be administered openly." *Id.* at 302. This court further made clear that, "to be constitutional, a proceeding must either not be secret or not 'administer justice' within the meaning of section 10." *Id.* This court has also explained that the terms of Article I, section 10, are unqualified and that a court may not balance, for example, a witness's "secrecy interest" against the command of Article I, section 10. 303 Or at 304.

The court in *O'Leary* emphasized that Article I, section 10, is directed at adjudications. 303 Or at 303. The court first asked whether the closed hearing outlined in *former* ORS 136.617 (1987) was "an administration of justice within the meaning of section 10." *Id.* The court noted that "not every proceeding involving the administration of justice, in the general sense of that term, need be open to the public." *Id.* The court continued, "To the extent that adjudications are not involved, the administration of justice is not governed by [section 10]." *Id.* Ultimately, the court concluded that the hearings outlined in *former* ORS 136.617 (1987) qualified as adjudications that fell within the scope of Article I, section 10. *Id.* Because the statute required those hearings to be closed to the public, the statute violated Article I, section 10. 303 Or at 305.

*Deiz* and *O'Leary* concerned the effect of Article I, section 10, on the authority of a trial court to close a courtroom to the public or a part of the public. *Olsen* addressed the application of Article I, section 10, in the context of a court's refusal to allow the copying of a trial exhibit. It is clear that *Olsen* is the more pertinent authority

22

here. Nevertheless, intervenors argue that this court made strong statements in *Deiz* and *O'Leary* about the breadth of the open courts provision and its important underlying purpose. They point, for example, to the passage in *O'Leary*, quoted above, stating that "the importance of visibility in the administration of justice goes far beyond the presentation of admissible evidence at trial" and that open justice assures "accountability for the * * * evidence used or not used." 303 Or at 304 (*quoting Deiz*, 289 Or at 288 (Linde, J., concurring)). From those passages, intervenors argue that a denial of access to the exhibits in question will prevent the public from confirming, in a visible and tangible way, that the court and jury have properly administered justice in the underlying case.

Intervenors have taken this court's statement in *Deiz* and *O'Leary* out of context. Those statements confirm that a court does not comply with Article I, section 10, by confining the public's attendance in court to only the presentation of admissible evidence. The principle of open justice entitles the public to attend and to view the other aspects of the administration of justice in a court -- such as a proceeding to suppress inadmissible evidence -- to ensure that the court and the parties comply with the law, and appear to do so, in an accountable manner. The constitutional mandate for "the open and visible administration of justice * * * that can be seen to be so during and after the event," *Deiz*, 289 Or at 286 (Linde, J., concurring), does not entitle the public to inspect every trial exhibit at the end of a trial. If that were the case, this court would have decided *Olsen* differently. The accountability for evidence used and not used, to which Justice Linde referred in *Deiz*, is the product of the public's right to see and hear a party's efforts in court to introduce and use evidence, or decline to introduce or use evidence, and to see and hear the court's decision in response to those efforts. But the constitutional

23

right to an open court does not create -- if we follow intervenors' logic -- a right in every observer, at the end of a court proceeding, to obtain the release of the evidence admitted or not admitted during the proceeding.

It cannot be gainsaid that the evidence in a case, consisting of documents and other material property, may play an important, if not decisive, role in shaping the strategy and arguments of the parties and the decisions of the court. As this case illustrates, the public or the media may develop an interest in the content of exhibits or other evidence introduced in a trial. Those circumstances, and other legitimate factors, may lead a court to conclude that granting a request to inspect all or part of the evidence in a case at the close of trial will foster public understanding of the administration of justice despite any inconvenience, loss, embarrassment, or other negative consequence to any person or entity that also may result from the inspection. But that may not be true in every case.

We will not attempt to catalogue here the complete range of circumstances in which a court permissibly may exercise its authority to limit the disclosure of exhibits, as discussed above, at the close of a trial. We agree with the trial court, however, that among those circumstances is the need to protect those who have been victims of child sexual abuse and those who have reported suspected child sexual abuse to others with authority to investigate, from embarrassment, retaliation, or other harm.

We have reviewed the trial court's decision in this case to redact the names of child abuse victims and persons reporting suspected child abuse from the records that the court ordered to be disclosed to intervenors at the conclusion of the trial. The court, in our view, reasonably exercised its discretion to prevent undue injury and

24

embarrassment to innocent persons that likely would result from public disclosure of the names in the exhibits.[9] *See*, *Olsen*, 300 Or at 406-07 ("[i]n a proceeding in mandamus, we can overrule the trial judge's decision only if we find there to have been an abuse of discretion").

Having concluded that the trial court's order requiring the redaction of the names of the victims and the reporters of the alleged abuse prior to public release of the ineligible volunteer file exhibits did not violate Article I, section 10, and was not an abuse of discretion, we now turn to intervenors' second challenge to the trial court's order regarding the trial court's decision to grant a stay of its order "pending appellate review." Intervenors primary argument is that Article I, section 10 does not permit public access to the evidence to be denied pending completion of appellate review. Intervenors also point out that the trial court cited no authority -- no statute, rule, or case -- for its decision to stay the release of the documents pending appellate review. We disagree with the underpinnings of intervenors' argument. Because we conclude that Article I, section 10, creates no absolute public right of access to trial exhibits at the close of trial, and

---

[9]     As to the redaction of the names of alleged crime victims, courts have a history of protecting the identities of children in various types of cases, including cases, like this one, involving alleged sexual abuse. For example, in *State v. McIntyre*, 194 Or 415, 416, 242 P2d 189 (1952), this court referred to the minor victims as "John Doe" and "Richard Roe" in a criminal case alleging a "crime against nature." In *State v. DuBois*, 175 Or 341, 344, 153 P3d 521 (1944), this court referred to a minor female victim as "Miss X" because she was a "victim rather than an accomplice." Similarly, this court and the Court of Appeals have substituted initials or fictitious names for minors' names in case titles and in opinions. *See, e.g., T. R. v. Boy Scouts of America*, 344 Or 282, 181 P3d 758 (2008) (civil case involving alleged child sexual abuse); *State ex rel Juv Dept v. Cornett*, 121 Or App 264, 267 n 1, 855 P2d 171 (1993) (domestic relations and termination of parental rights proceeding, referring to children by initials in case title and throughout opinion).

therefore also conclude that the trial court's redaction of certain names in the ineligible volunteer file exhibits did not violate Article I, section 10, we also conclude that the trial court's decision to stay the effectiveness of its order pending appellate review did not violate Article I, section 10. [10]

We summarize our conclusions as follows. In regard to the mandamus petition of the BSA, we disagree with the trial court's reasoning in deciding that Article I, section 10, required the court to dissolve its protective order concerning the lists of names of alleged child sexual abuse victims and reporters of suspected child sexual abuse. The trial court, however, sufficiently explained in the alternative that, if the court had discretion in the matter, the court would choose to release the lists of names in a redacted form. Upon review, we assume that any right to inspect exhibits at the close of trial was subject to the trial court's discretion. The court reasonably exercised its discretion in all the circumstances. Thus, there is no basis to grant relief in mandamus to the BSA.

In regard to the mandamus petition of intervenors, we conclude, as noted, that the open courts provision in Article I, section 10, did not require the trial court, at the end of a trial, to order the release of exhibits that were subject to an earlier protective order requiring that the parties maintain their confidentiality at the close of trial. The court had discretion to order, on good cause shown, the release of those documents subject to the redaction of names set out in the exhibits to protect victims of child sexual

[10] We do not seek by our decision to encourage trial courts generally to refuse access to trial exhibits at the end of a trial. As we have endeavored to make clear, this court will evaluate any decision to deny access to a trial exhibit to determine whether it reflects a reasonable exercise of discretion. We also point out that our decision does not concern public access to the case files of the court, an issue that may call for a different legal analysis.

26

abuse and reporters of child sexual abuse from embarrassment, retaliation, or other harm. The court in this case properly exercised that authority. Additionally, the court did not violate Article I, section 10, by staying the effectiveness of its disclosure order pending appellate review.

The alternative writs of mandamus are dismissed.

27