# Illinois Official Reports

## Appellate Court

---

### *Doe No. 2 v. Boy Scouts of America*, 2016 IL App (1st) 152406

---

| | |
|---|---|
| Appellate Court Caption | JOHN DOE NO. 2, JOHN DOE NO. 3, JOHN DOE NO. 4, JOHN DOE NO. 6, JOHN DOE NO. 7, JOHN DOE NO. 8, JOHN DOE NO. 9, JOHN DOE NO. 10, JOHN DOE NO. 11, JOHN DOE NO. 12, JOHN DOE NO. 13, JOHN DOE NO. 14, JOHN DOE NO. 15, JOHN DOE NO. 16, JOHN DOE NO. 17, and JOHN DOE NO. 18, Plaintiffs-Appellees, v. BOY SCOUTS OF AMERICA, a Congressionally Chartered Corporation, Authorized to Do Business in Illinois; and CHICAGO AREA COUNCIL, BOY SCOUTS OF AMERICA, Defendants-Appellants. |
| District & No. | First District, Fifth Division<br>Docket No. 1-15-2406 |
| Filed<br>Rehearing denied | September 30, 2016<br>November 29, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 2012-L-13569; the Hon. Moira S. Johnson, Judge, presiding. |
| Judgment | Certified question answered. |
| Counsel on Appeal | Robert Marc Chemers, Scott L. Howie, John J. Walsh III, and Edward J. Aucoin, Jr., of Pretzel & Stouffer, Chtrd., of Chicago, and Dana C. Crowley, of Dana Crowley & Associates, of Barrington, for appellants.<br><br>Christopher T. Hurley and Evan M. Smola, of Hurley McKenna & Mertz, of Chicago, for appellees. |

Panel                                PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justice Reyes concurred in the judgment and opinion.
Justice Lampkin dissented, with opinion.

**OPINION**

¶ 1        In 2013, plaintiff John Doe 2 joined an existing lawsuit against defendants Thomas Hacker, Boy Scouts of America (BSA), and the Chicago Area Council (CAC), as 1 of 18 plaintiffs alleging that they were sexually abused as children by Hacker, their former scoutmaster in the Boy Scouts.[1] The present appeal involves the claims of plaintiff Doe 2 only (plaintiff). In addition, Hacker was voluntarily dismissed as a defendant from the lawsuit, so that only the Boy Scout defendants remain.

¶ 2        In the current third amended complaint, plaintiff alleges that defendants BSA and CAC (the Boy Scout defendants) knew that Hacker had sexually abused Boy Scouts as a scoutmaster long before his abuse of plaintiff, but they nevertheless allowed Hacker to serve as the scoutmaster for plaintiff's troop, where he sexually abused plaintiff from 1983 to 1986. It is undisputed in this lawsuit that Hacker abused plaintiff at official Boy Scout events and outings between 1983 and 1986. Plaintiff alleges counts of negligence, fraudulent concealment of claims, and equitable estoppel against the Boy Scout defendants.

¶ 3        The Boy Scout defendants moved for summary judgment against plaintiff, claiming that plaintiff's action against them was time-barred under the two-year statute of limitations for personal injury actions. In response, plaintiff argued that his claim was timely under the fraudulent concealment statute (735 ILCS 5/13-215 (West 2012)), where the Boy Scout defendants had concealed their knowledge of Hacker's conduct, thereby concealing their liability for Hacker's actions. The trial court denied the Boy Scout defendants' motion for summary judgment, but upon their motion, certified a question for interlocutory review to this court under Illinois Supreme Court Rule 308 (eff. Jan. 1, 2015).

¶ 4        The trial court certified the following question to this court:

> "Does the fraudulent-concealment statute of limitations permit a plaintiff to maintain an otherwise time-barred action for child sexual abuse when he testifies that he knew, before the action was time-barred, that he had sustained a physical injury from the abuser's conduct and that the abuser had been arrested and tried for similar crimes?"

¶ 5        The word "permit" means "to allow" or "to make something possible." Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/permit (last visited Sept. 29, 2016). Thus the question asks to decide whether a suit is possible under the stated conditions.

¶ 6        In sum, a "no" answer to the above question would mean that, as a matter of law, a plaintiff's knowledge that he had sustained a physical injury, and that his abuser was arrested and tried for similar crimes, would bar a plaintiff from invoking the fraudulent concealment

_____

[1]Two of the 18 plaintiffs have settled their claims, and 16 plaintiffs remain in the pending suit against defendants.

statute under *all* circumstances and against *any* party who could be potentially liable. We cannot agree with this proposition.

¶ 7     As a result, and for the following reasons, we answer "yes" to the certified question.

¶ 8                                BACKGROUND

¶ 9                              I. Procedural History

¶ 10     In 2013, shortly before turning 40, plaintiff joined this existing case as an additional plaintiff. The current third amended complaint, filed May 28, 2015, includes counts of negligence, fraudulent concealment of claims, and equitable estoppel against the Boy Scout defendants. In the complaint, plaintiff alleges that defendant BSA knew that Hacker was a serial pedophile by 1970, when he was first banned from scouting. Nevertheless, defendant BSA allowed Hacker to register with defendant CAC in 1984, where he sexually abused plaintiff. Plaintiff alleges that the Boy Scout defendants were aware, long before plaintiff entered scouting, that there was a longstanding and widespread problem of adult scout leaders sexually abusing minor scouts and that their system for banning pedophiles (the IV files) was not working. Plaintiff alleges that the Boy Scout defendants negligently failed to protect him from Hacker's abuse, fraudulently concealed all of the above knowledge, and represented to plaintiff that scouting was a safe activity for boys. Plaintiff further alleges that defendant BSA stood in a special, fiduciary relationship with him, such that the Boy Scout defendants had a duty to disclose this knowledge and their culpability for his abuse.

¶ 11     The Boy Scout defendants moved for summary judgment against plaintiff on September 12, 2014.[2] Claiming that plaintiff had acknowledged knowing of the wrongfulness of his abuse and at least some of his resulting injuries at the age of 14, the Boy Scout defendants argued that his two-year limitations period for filing suit had been tolled only during the time he was a minor. Because it began to run when he turned 18, the Boy Scout defendants argued, the limitations expired when plaintiff turned 20, nearly 20 years before he filed his claim.

¶ 12     In response, plaintiff argued that the Boy Scout defendants had fraudulently concealed his cause of action, which had tolled the statute of limitations until late 2012. Plaintiff argued that the Boy Scout defendants' affirmative representations that they did not know of Hacker's past history of abuse constituted fraudulent concealment. Plaintiff further argued that, even in the absence of these affirmative acts, defendants' silence constituted fraudulent concealment because they were in a special relationship with him while he was a boy scout and had thus been obligated to inform him of "his cause of action." Because of this fraudulent concealment, plaintiff argued that his claim was timely, as the five-year limitations period provided by the fraudulent concealment statute had started running only in late 2012, shortly before he first learned of his cause of action after viewing publicized Perversion Files.

¶ 13     The trial court denied the Boy Scout defendants' motion for summary judgment on January 8, 2015. The report of proceedings shows that the trial court concluded that there was a genuine issue of material fact as to whether defendants were in a special relationship with plaintiff, such that they had been required to tell him of his potential claim against them. CAC filed a

_____

[2]As noted above, the current third amended complaint was filed on May 28, 2015. The Boy Scout defendants' motion for summary judgment was based on the first amended complaint, which was filed on August 7, 2013. The counts and allegations in both complaints are essentially the same.

- 3 -

motion to reconsider denial of its motion for summary judgment on April 20, 2015, which the trial court denied.

¶ 14 The Boy Scout defendants filed a motion to certify a question for interlocutory review under Illinois Supreme Court Rule 308 (eff. Jan. 1, 2015) on June 12, 2015. On June 30, 2015, the trial court denied the Boy Scout defendants' motion to certify a question for interlocutory review without prejudice. On July 10, 2015, the Boy Scout defendants filed an amended motion to certify a question under Illinois Supreme Court Rule 308 (eff. Jan. 1, 2015). On August 17, 2015, the trial court granted the Boy Scout defendants' amended motion. On August 31, 2015, the trial court certified the following question to this court:

> "Does the fraudulent-concealment statute of limitations permit a plaintiff to maintain an otherwise time-barred action for child sexual abuse when he testifies that he knew, before the action was time-barred, that he had sustained a physical injury from the abuser's conduct and that the abuser had been arrested and tried for similar crimes?"

The same day, defendants filed a petition for leave to appeal to this court. We granted the petition on September 30, 2015. As noted above, defendant Hacker was voluntarily dismissed from this lawsuit, and the only remaining claims are against defendants BSA and CAC for negligence, fraudulent concealment, and equitable estoppel.

¶ 15 On May 12, 2016, plaintiff filed a motion to strike portions of the Boy Scout defendants' brief and to supplement the record on appeal. In this motion, plaintiffs argued that a significant portion of the Boy Scout defendants' brief in support of its Rule 308 appeal contains argument without any factual support or citation to the record, in violation of Illinois Supreme Court Rule 341 (eff. Jan. 1, 2016). Specifically, plaintiff argued that the Boy Scout defendants' brief references cases of other boy scouts against defendants to argue that plaintiff should have known of his cause of action earlier but that the Boy Scout defendants refuse to disclose the identity of such cases. We granted plaintiff's motion to strike on May 19, 2016, and struck all portions of the Boy Scout defendants' brief not supported by the record on appeal.

¶ 16 Below we provide only a summary of the extensive discovery and exhibits that are part of this record on appeal.

¶ 17 II. Structure of BSA and CAC

¶ 18 According to defendant BSA's charters and bylaws,[3] defendant BSA is organized with a national office in Irving, Texas (the National Council). The National Council grants charters to local councils in every state, and these councils oversee Boy Scout operations on a regional basis. Defendant CAC is one such local council and was responsible for the scouting program in a large part of the Chicago metropolitan area in the 1980s. The head of each local council is called a scout executive. A local council, in turn, is comprised of charter organizations, usually churches, schools, or other civic organizations which sponsor and form Boy Scout Troops or Cub Scout Troops. For example, the charter organization that sponsored Troop 1600—plaintiff's troop—was St. Louis De Montfort Catholic Church in Burbank, Illinois.

---

[3]Defendant BSA's charters and bylaws are attached as exhibit No. 2 to plaintiff's response to defendants' motion for summary judgment.

¶ 19      According to defendant BSA's rules and regulations,[4] its bylaws require its local councils, such as defendant CAC, to abide by the policies, procedures, rules, and regulations of defendant BSA. In order for defendant CAC to receive a charter from defendant BSA, it had to agree to abide by defendant BSA's policies and procedures. Defendant BSA's bylaws and Procedures for Maintaining Standards of Leadership specify its rights to review, approve or remove scout leaders. As the 1982 Procedures for Maintaining Standards of Leadership[5] instructed:

> "No person shall be approved as a leader unless, in the judgment of the corporation, that person possesses the moral, educational, and emotional qualities deemed necessary for leadership and satisfies such other leadership qualifications as it may from time to time require."

¶ 20      In his deposition,[6] James Terry, former assistant chief scout executive of defendant BSA, testified that defendant BSA relies on its local councils, such as defendant CAC, and on sponsoring organizations to act on its behalf and carry out defendant BSA's rules, regulations, policies, and procedures. Defendant BSA also relies on local councils to monitor and report suspected child sexual abuse in accord with its policies and procedures. A chartered organization works for the local council, and the local council in turn reports to the National Council.

### III. The IV Files

¶ 21

¶ 22      According to the affidavit of Martin Walsh,[7] manager of the Membership Impact Department of defendant BSA as of 2012, defendant BSA has maintained an "Ineligible Volunteer" file system (the IV files) since approximately 1920.[8] The IV files are a centralized file system that records adults whom, for various reasons, defendant BSA considers ineligible for membership positions. The IV files collect identifying information on such adults. The purpose of the IV files is to prevent these individuals from registering with any scouting organization in the future. According to a 1935 *New York Times* article,[9] in the first 15 years after defendant BSA created the IV file system, a total of 2919 men were placed in the files, and about 30% of those men had engaged in sexual misconduct with scouts.

---

[4]The Boy Scouts of America Rules and Regulations, dated 1986, is attached as exhibit No. 1 to plaintiff's response to defendants' motion for summary judgment.

[5]The Procedures for Maintaining Standards of Leadership is attached as exhibit No. 4 to plaintiff's response to defendants' motion for summary judgment.

[6]A transcript of the videotaped deposition of James Terry, May 21, 2013, in the matter of L.M. v. Boy Scouts of America, No. 11-2-18616-4 SEA (Wash. Super. Ct.), is attached as exhibit No. 3 to plaintiff's response to defendants' motion for summary judgment.

[7]All references to the affidavit of Martin Walsh refer to the affidavit of Martin Walsh, filed by defendant BSA on January 17, 2012, in the matter of B.M. v. Boy Scouts of America, No. CDV-11-0782 (D.C. Mont.), which is attached as exhibit No. 15 to plaintiff's response to defendants' motion for summary judgment.

[8]The file system was originally called the "Red Flag" files. Later, the name was changed to the "Confidential Files," and now defendant BSA refers to them as the "Ineligible Volunteer files."

[9]The article (*Boy Scouts Head Explains "Red" List*, New York Times, June 9, 1935), is attached as exhibit No. 16 to plaintiff's response to defendants' motion for summary judgment.

¶ 23    According to Walsh's affidavit, defendant BSA's IV file system contains a list of the names of banned volunteers and BSA employees who can be cross-referenced to an IV file under the same name. The IV file, in turn, contains detailed information on why the person is banned from scouting. There are different categories of IV files, including those labeled "Perversion," which relate to adult leaders' sexual misconduct. The Boy Scout defendants have disclosed their Perversion Files[10] for the time period of 1960-90.[11] The disclosed Perversion Files reflect that defendant BSA created at least 2549 files on the sexual misconduct of adult leaders between 1960 and 1990. Many of the disclosed files include identifying information of scout leaders, like Hacker, who had abused numerous children. In 1988, the year of Hacker's arrest, defendant BSA created 314 files for adult volunteers engaging in sexual misconduct with scouts.

¶ 24    According to Walsh's affidavit, defendant BSA closely guarded the existence and content of the IV files. Defendant BSA employed just a few people in its central headquarters to manage the IV file system, including a director-level position whose primary responsibility was to maintain the files. In a deposition,[12] Paul Ernst testified that he held the title of BSA's director of Registration and Subscription Services from 1971-93. In his deposition in the present matter,[13] Ernst testified that an integral part of his responsibility as director was to maintain the IV file system and keep it updated. Ernst testified that it is defendant BSA's policy to require all adult leaders to register each year with the organization. All of these registrations were processed through Ernst's office during his tenure as director. Each adult registration during Ernst's tenure was checked yearly against the IV files. In his deposition, Ernst testified that access to the IV files was very limited:

"Q. Who had access to the file cabinet?

A. I did, of course. And we had a couple of employees who worked on these that had access, but it was very limited."

---

[10]The "Perversion Files" is defendants' shorthand for the subset of the IV files that involve sexual misconduct by adult leaders.

[11]As discussed below, BSA's Perversion Files for 1965-85 were made public pursuant to a court order from the Honorable John Wittmayer, Multnomah County Circuit Judge for the State of Oregon, in the case of Lewis v. Boy Scouts of America, No. 0710-11294 (Cir. Ct. Multnomah Co.). The Oregon Supreme Court upheld the order in *Jack Doe 1 v. Corp. of the Presiding Bishop of the Church of Jesus Chris of Latter-Day Saints*, 280 P.3d 377, 380 (Or. 2012). The files are available online at http://crewjanci.com/resources/boy-scout-perversion-files/ (last visited July 20, 2016). Defendants have conceded in the case at bar that these publicly available files are true and accurate copies of BSA's Perversion Files for the time period of 1965-85, and for portions of 1960-64. In response to an order of the trial court in the present case, BSA produced a total of 1225 Perversion Files for 1986-90. Plaintiff has included a sample of these Perversion Files as exhibit No. 21 to its response to defendants' motion for summary judgment.

[12]A transcript of the video deposition of Paul Ernst, taken in the matter of NK v. Corp. of the Presiding Bishop of the Church of Latter-Day Saints, No. 09-2-41575-7 KNT (Wash. Super. Ct.), is attached as exhibit No. 11 to plaintiff's response to defendants' motion for summary judgment.

[13] All remaining references to the deposition of Paul Ernst refer to the "Videotaped Oral Deposition" of Paul Ernst, dated April 14, 2014, taken in the present matter. A transcript of this deposition is attached as exhibit No. 23 to plaintiff's response to defendants' motion for summary judgment.

¶ 25    The Boy Scout defendants' disclosed Perversion Files show that in 1972, shortly after Ernst took charge of BSA's IV files, he sent a "personal and confidential" letter from defendant BSA's headquarters to "all Scout executives" with the subject "Maintaining Standards of Leadership." In this letter, Ernst informed scout executives that he was enclosing guidelines that were "carefully developed" by defendant BSA to establish the kind of people who were safe to be scout leaders. He further described the confidential nature of such information:

"This is the first time such information has been printed and because of the misunderstandings which could develop if it were widely distributed, we suggest that after you have read it, you file it with other policy statements without making photocopies or sharing it beyond the top management of the council."

Ernst's memorandum outlined the manner in which local councils should report accusations "that would seem to cause [a leader] to be unfit as a leader or an associate of boys."

¶ 26    According to Walsh's affidavit, although scout executives at the local council level know of the existence of the IV files, they do not have access to the files. Their role is to compile supporting documents and forward them to defendant BSA to be placed in a particular adult leader's file. According to Ernst's deposition, local sponsoring or charter organizations, such as the churches and schools, did not have any access to the files during his tenure (1971-93), nor did they have any role in formally providing any documents to defendant BSA for inclusion in any file. Additionally, according to the trial testimony of Nathaniel Marshall,[14] who was senior membership administrator for defendant BSA as of March 4, 2010, defendant BSA never told troop volunteers or Scouts' parents about the existence of the files.

¶ 27    The disclosed Perversion Files contain a letter from Ernst to Ralph S. Kroehler, a council executive, dated December 15, 1981, regarding a reported sexual predator in which Ernst wrote:

"Please send me the details which you have in your files. We have always asked that all the records in this type of situation be kept in the national office and not in the local council office because of the embarrassment that could be incurred if the wrong individuals would read the file."

¶ 28    The disclosed Perversion Files contain another letter from Paul Ernst, dated November 25, 1985, in which Ernst wrote: "The [IV files are] kept very confidential in this office, since we allow only three individuals to have access."

¶ 29                    IV. Evidence of Child Abusers Circumventing the IV File System Before 1983

¶ 30    The disclosed Perversion Files show that defendant BSA had knowledge before 1983 (the year in which Hacker began abusing plaintiff) of how banned sexual predators were finding ways around the IV system, reentering scouting and continuing to sexually abuse children. For example, the disclosed Perversion Files contain a record of a scoutmaster who, after being removed from scouting in 1972 for sexually abusing boy scouts, was able to move to a new location and reregister as a scout leader, where he sexually abused more boys before his arrest

---

[14]The trial testimony of Nathaniel Marshall in Lewis v. Boy Scouts of America, No. 0710-11294 (Cir. Ct. Multnomah Co.) is attached as exhibit No. 20 to plaintiff's response to defendants' motion for summary judgment.

in 1977. Other examples in the disclosed Perversion Files show that flagged sexual predators were able to reregister as "multiples" in the 1970s and 1980s. A "multiple" is a banned individual who, at a new location, lies and says that he is registered with another troop or local council. Lastly, defendant BSA also had knowledge before 1983 that sexual predators were circumventing the IV system by changing their names or using aliases. For instance, the files show that in 1968 defendant BSA learned that a man who was removed from scouting in 1965 for sexually abusing boys had been able to abuse boys in a different council by changing his middle initial. In his response to the Boy Scout defendants' motion for summary judgment, plaintiff provided additional examples of sexual predators successfully circumventing the IV file system.

¶ 31    The disclosed Perversion Files contain an internal memorandum from a scout executive to Ernst, dated September 26, 1984, in which the scout executive wrote:

> "I am never quite clear on how we should communicate with you about people who we won't readmit into professional scouting.
>
> [Name of banned pedophile] is the kind of person my instinct tells me might very well attempt to resurface somewhere as a volunteer.
>
> If you agree you need to place info about him in your files—how much more information do you need?
>
> I really think we should spend some time discussing cases like this and how we should feed info to you—so we can prevent people like this guy from slipping in as volunteers. To my knowledge, there is no written guideline for either of us to follow. Let me know if you agree that a meeting is in order, and lets [*sic*] set a time."

¶ 32    <center>V. Hacker's History of Child Abuse Prior to 1983</center>

¶ 33    Defendant BSA created an IV file for Hacker in 1970.[15] A 1988 newspaper article[16] in Hacker's IV file summarizes Hacker's history of child sexual abuse. The accuracy of the article is supported by letters written by and to defendant BSA in Hacker's IV file. According to the article, Hacker was arrested and charged with assault and battery in Indiana in 1961, after individual boy scouts told their parents that Hacker had entered their tents at night on a campout. Although the charges were dismissed, Hacker was discharged from his teaching position at the time and was suspended as scoutmaster. Hacker was reinstated as scoutmaster after his trial. Hacker held positions in the Indiana public school system and at BSA for the rest of the 1960s.

¶ 34    Hacker's IV file contains a letter dated February 26, 1970, from Frank M. Chase, scout executive of the Central Indiana Council at the time, to Ernst's predecessor, Earl L. Krall, director of BSA's Registration & Fulfillment Service at the time. The letter reported three adult leaders, including Hacker, for inappropriate behavior. Chase related that Hacker had been accused of molesting local children and should not remain a member of defendant BSA:

> "In addition, I would like to report on Thomas E. Hacker, who has really caused a storm in our council and in Indianapolis. He was registered as a Scoutmaster in the Mt.

---

[15] Hacker's IV file is attached as exhibit No. 24 to plaintiff's response to defendants' motion for summary judgment.

[16] *Suspect in child molesting able to keep past hidden*, Daily Southtown, 1988.

Olive Methodist Church in the West District a few years ago; we had reports there was a problem. He was removed as Scoutmaster of that troop, but we could not secure anything definite from parents or boys on which we could act. Mr. Hacker was taken to court and released because parents did not appear against him and there was lack of sufficient evidence. At the time, a prominent member of my board called me to say that he knew the family, that Tom was a fine young man, and asked that he not be placed on our 'red flag' list [*i.e.*, IV file system]. Because of no concrete evidence, at the time, we did not do this for which I have had many hours of regret.

Also, at the time Mr. Hacker was a bachelor. He moved to Charlottesville on the east edge of Hancock County, married (in fact he now has two sons), then moved back into the city in the school system on the east side, and, frankly, with over 9,000 leaders and not being close to many of them, we made the mistake of not banning Tom from leadership in our council. In 1964, he did register as an Assistant Scoutmaster in one of the finest troops on the far east side of Marion County. He served two years there, and then he dropped out or was asked to drop out. If he was asked to leave, we did not receive any information of anything wrong at the time. In October of 1968, he registered as Scoutmaster of another troop on the far east side of Indianapolis. The District Executive became suspicious a couple of months ago, and he finally met with the Troop Committee and Hacker was asked to resign. We were placing him on our 'red flag' list when everything broke. I am enclosing the two newspaper clippings which give the story. This man should not be allowed to register in the Boy Scouts of America at any time or any place."

Hacker's IV file contains the newspaper article referred to in the above letter.[17] The newspaper article reported that police had compiled a list of 51 names of boys whom Hacker allegedly molested as a schoolteacher in Indianapolis and that Hacker had been indicted on a charge of assault and battery to gratify sexual desires.

¶ 35    Hacker's IV file contains return correspondence dated March 18, 1970, from Krall to Chase, in which Krall confirmed receipt of the letter and newspaper article about Hacker's child molestation charges. Krall wrote: "We have placed this information in our file and have taken steps to have [the names of Hacker and two others] deleted from our records." In the correspondence, Krall also requested that Chase fill out a "confidential record sheet" for Hacker and the two other men. He explained: "[These sheets] will enable us to identify all three men, should they ever again attempt to register in the Scouting program."

¶ 36    Hacker's IV file contains Hacker's confidential record sheet, which is dated June 8, 1970, and signed by Chase. The sheet notes that Hacker had been a scoutmaster for a troop in Indianapolis from October 1967 to March 1970 and describes the reason for creating an IV file on Hacker:

"Arrested for homosexual activity with many boys both in scouting and through the school in which he was teaching. Grand jury has indicted him. Trial to be conducted in August, 1970. He has resigned his teaching position."

¶ 37    In return correspondence from Krall to Chase, dated June 15, 1970, Krall confirmed receipt of the confidential record sheet on Hacker and requested that Chase write him again to notify him of the outcome of Hacker's trial. The record does not contain a response from Chase.

_____

[17]List of Boys Allegedly Molested By Teacher Grows to 51 Names, 1970 (publication unknown).

¶ 38    Hacker's police record[18] shows that he pled guilty in 1970 to assault and battery with the intent to gratify sexual desires. A judge in Indianapolis gave him a one- to five-year suspended sentence and two years of probation.

¶ 39    Hacker's IV file contains a letter, dated October 27, 1971, by Arthur J. Allen, scout executive of the Northwest Suburban Council (local council for the northwest suburbs of Chicago), in which he wrote to Ernst, who had just become the supervisor of BSA's Registration and Membership, that Hacker had molested a child in Des Plaines, Illinois:

> "Mr. Thomas Edwards *** is currently registered as District Publicity Committee Chairman, and Scoutmaster of Troop #117, Northwest Suburban Council.
>
> Within the last week, it has come to our attention, that Mr. Edwards has been arrested on charges of taking indecent liberties with a child. Mr. Thomas Edwards is also known as Mr. Thomas Hacker.
>
> We have also been able to learn that Mr. Edwards was very active in Scouting in the Central Indiana Council, Indianapolis, Indiana.
>
> Enclosed you will find a photocopy of a local news article pertaining to the incident.
>
> We have removed Mr. Edwards from both Scouting capacities locally, and would appreciate any additional information or guidance that you might be able to provide."

¶ 40    Hacker's IV file contains a reply letter from Ernst to Allen dated November 2, 1971:

> "Thank you for your letter of October 27 concerning Thomas Edwards. You have uncovered the case of a furtive individual who has successfully attained registration in the Boy Scouts of America by changing his name. We have had Mr. Thomas E. Hacker on the Confidential File since June, 1970 for exactly the same reasons you presented.
>
> Under no circumstances do we want this man registered in Scouting. We are taking steps to have his name deleted from our records and adding the additional information you sent to his file."

¶ 41    Hacker's police record shows that he was convicted in Cook County of taking indecent liberties with a child on November 23, 1971.

¶ 42    Hacker's police record shows that the Oak Lawn police department arrested him on June 19, 1976, for grabbing a victim, throwing him down on the floor, and pulling his pants down.

¶ 43                           VI. Hacker's Abuse of Plaintiff

¶ 44    In his affidavit,[19] plaintiff averred that he joined the Boy Scouts in the fall of 1983 at the age of 10. He was a scout in Troop 1600. Plaintiff joined the Boy Scouts because many of his friends were involved, and because his parents thought that the organization would instill positive values in him and offer a safe, social activity. When he joined the troop, plaintiff received a copy of the Official Scout Handbook (handbook). The handbook instructed scouts on a variety of topics. It contained the scout oath and guidelines for living a healthy and moral

---

[18]All references to Hacker's police record refer to the information from the State Police file regarding Hacker, which is attached as exhibit No. 45 to plaintiff's response to defendants' motion for summary judgment.

[19]All references to plaintiff's affidavit refer to the affidavit of plaintiff attached as exhibit No. 27 to plaintiff's response to defendants' motion for summary judgment.

life. The handbook functioned as a guide for helping a boy become a man. It instructed plaintiff and other scouts about the importance of a scoutmaster. It indicated that plaintiff could look to his scoutmaster for advice. The handbook's references to the importance of the scoutmaster made it clear to plaintiff that he should trust and be loyal to his scoutmaster. Plaintiff was loyal to his scoutmaster and trusted the Boy Scouts when he joined. He took the scout oath seriously, and obeyed scout law to the best of his ability. He was obedient to his superiors, including his scoutmaster. Plaintiff averred that nothing in the handbook, or any other instruction that plaintiff was given, provided him with information about protecting himself from sexual abuse; nothing in the handbook provided any warning or history of sexual abuse of scouts by adult leaders.

¶ 45 Plaintiff averred in his affidavit that Hacker became his scoutmaster shortly after plaintiff joined the troop. Hacker accompanied the troop on virtually every scout outing, and acted in a friendly, cordial way toward plaintiff upon meeting him. Hacker initially behaved like a friend that plaintiff felt he could trust, matching the handbook's description of a scoutmaster. Plaintiff's affidavit stated that both plaintiff and his parents trusted Hacker because he was scoutmaster and because he was an important leader in the troop. Plaintiff believes that his parents trusted Hacker and considered scouting to be a safe activity because they would not have let him participate in activities that they did not deem to be safe. Plaintiff also averred that his parents believed that Hacker was a vetted and trustworthy leader in the Boy Scouts because of his prominent role in the organization. Plaintiff did not believe that Hacker would harm him, given Hacker's role in scouting. Plaintiff averred that plaintiff's parents would not have allowed him to participate in scouting or be alone with Hacker if they had known that he sexually abused children in Indiana and the Northwest suburbs of Chicago.

¶ 46 As we observed earlier, it is undisputed that Hacker sexually abused plaintiff between 1983 and 1986 at official Boy Scout events and outings. In his deposition,[20] plaintiff testified that Hacker's abuse started gradually, but became very aggressive. The sexual abuse included Hacker's fondling of plaintiff's genitals, mutual masturbation, oral sex and anal rape. Plaintiff estimated that Hacker abused him on 100 occasions. Plaintiff experienced intense physical pain during Hacker's first act of anal penetration and bled afterwards. Some of Hacker's sexual abuse of plaintiff occurred in a group setting, with other boy scouts present. During the period of Hacker's abuse, plaintiff experienced extreme emotional distress and physical pain. He testified that, at one point, Hacker threatened to kill his parents. Hacker's sexual abuse of plaintiff ended sometime in 1986.

¶ 47 In defendant BSA's response to plaintiff's third request to admit (1) defendant BSA admitted that it had received a charter renewal overflow page from Boy Scout Troop 1600 in Burbank, Illinois, in February of 1984; (2) defendant BSA admitted that a document attached by plaintiff in his third request to admit was that charter renewal overflow page; and (3) defendant BSA admitted that the charter renewal overflow page identified an adult member as "Tom Hacker."

¶ 48 Plaintiff averred in his affidavit that once the abuse ended, he did everything he could to move past it. He successfully blocked the abuse out of his mind. He did not let it impact his

---

[20]All references to plaintiff's deposition refer to his discovery deposition taken on May 9, 2013, which is attached as exhibit No. 26 to plaintiff's response to defendants' motion for summary judgment.

activities or education. He eventually obtained a master's degree and embarked on a successful career.

¶ 49                               VII. Hacker's 1988 Arrest and Conviction

¶ 50        Hacker's IV file shows that he was arrested in Burbank, Illinois, in 1988 and charged with sexually assaulting young boys between 1983 and 1987 on Boy Scout campouts. According to a State Police report, attached as an exhibit to defendants' motion for summary judgment, plaintiff was interviewed by Illinois State Police officers and investigators with the Department of Children and Family Services (DCFS) in connection with Hacker's arrest and sexual assault charges on February 8, 1988, when plaintiff was 14 years old. According to the State Police report, plaintiff told them that he had observed Hacker engage in various sex acts with other boy scouts. As discussed further below, plaintiff did not tell anyone about Hacker's abuse of him until 2013, shortly before plaintiff turned 40.

¶ 51        At the time of Hacker's arrest in Burbank, Illinois, Ken Walters was serving as CAC's director of finance and support services. A newspaper article published on February 11, 1988,[21] included statements from Walters about the arrest:

> "As a result of [Hacker's] 1970 conviction, Hacker was placed on the 'red flag'—or undesirable—list of the Boy Scouts.
>
> Ken Walters, director of financial services for Chicago area Boy Scouts, said the organization makes background checks through the confidential list but theorizes that Hacker was never placed on it.
>
> He said it's difficult to determine the nature of all 1.5 million adults in Scouting.
>
> 'Here was a popular, well-respected man in the community,' Walters said. 'Local people in control of an organization must make sure the people in control of kids are people of good quality.' "

¶ 52        The *Chicago Tribune* also published an article about Hacker's arrest on February 11, 1988.[22] The article reported statements from both Walker and BSA's national spokesman at the time, Barclay Bollas, regarding Hacker's arrest:

> "Ken Walters, director of finance and support services in the Boy Scouts' Chicago office, said Hacker's name never was caught by the computer that annually checks the names of all adult Scout volunteers against the list.
>
> 'Obviously, he's not on that system,' Walters said. 'It would have come up.'
>
> Spokesman Barclay Bollas at the Boy Scouts' national headquarters in Irving, Tex., declined Wednesday to say whether Hacker's name appears on the list, saying, 'We consider that list confidential.' "

At his deposition,[23] Walters testified that at the time of Hacker's 1988 arrest he had called the registration and subscription department at defendant BSA's national headquarters to check to

---

[21]The article (*Ex-Scout Leader Charged in Sex Case*, Daily Southtown, Feb. 11, 1988)), is attached as exhibit No. 31 to plaintiff's response to defendants' motion for summary judgment.

[22]The article (*Ex-Boy Scout leader faces abuse charges*, Chi. Trib., Feb. 11, 1988) is attached as exhibit No. 32 to plaintiff's response to defendants' motion for summary judgment.

determine if Hacker's name was in the IV files. Upon requesting this information, Walters testified that he was told that the list was confidential and that the national headquarters would not tell him whether or not Hacker's name was on the list.

¶ 53 Hacker's IV file contains correspondence from Ernst to defendant BSA's legal counsel, dated February 12, 1988, titled "Personal & Confidential," in which Ernst discusses Hacker's arrest:

"An individual by the name of Thomas E. Hacker was placed on the confidential file in 1970 because he was arrested for homosexual activity with boys. At that time, he was a school teacher and lived in Indianapolis, Indiana.

In 1971, we discovered that Mr. Hacker was registered in the Northwest Suburban Council, No. 751, in Arlington Heights, Illinois. At that time, he was registered on the district level and also the Scoutmaster of Troop 117 under the name of Thomas Edwards. When the council discovered that this was really Mr. Thomas Hacker they immediately sent a letter to us and he was, again, suspended and removed from all scouting responsibilities.

We had no other information concerning Mr. Hacker until yesterday when I received a call from the Chicago Tribune indicating that they wanted to talk with me about an individual who had been arrested in the Chicago council. I did not say anything to them except indicate that I would give them the number of our public relations spokesperson. This I did ***

I contacted Barclay Bollas and informed him about this call and told him he would be receiving a call.

Later in the afternoon, I received a call from Ted Hanley, asking about the registration of Thomas J. Hacker in Troop S1600 of Chicago. We checked the registration records and discovered that Mr. Hacker was registered as Tom T. Hacker as the Chairman of the Committee in Troop S1600.

I have kept in contact with both Mr. Hanley and Mr. Bollas related to this matter. We checked out microfilm records to determine the method by which Mr. Hacker became registered with the Boy Scouts of America after being on the confidential file, if this was indeed the same person, since we had Tom T. Hacker and our original file indicated Thomas E. Hacker.

We discovered that in 1984 a Tom Hacker was registered as a multiple as a Member of the Committee in Troop S1600. At that time we did not check multiple registrations of adults. We still do not check multiples on councils which mail their registration applications to the national office.

Mr. Hacker then reregistered as the Chairman of the Committee for the year ending January 31, 1986. At that time, in early 1985, we did not check reregistered individuals against the confidential file. However, we do so at the present time.

I believe this is the scenario as I am aware of it. I do understand that Mr. Tom T. or Tom J. Hacker was indicted on February 11 for 25 counts of oral sex with youth, most

_____

[23]A transcript of the videotaped deposition of Ken Walters, which was taken in the present matter on June 10, 2014, is attached as exhibit No. 6 to plaintiff's response to defendants' motion for summary judgment.

- 13 -

of whom seemed to be scouts. I also received information that he had resigned in November of 1987 as the Chairman of the Committee but had remained active in the unit until his arrest."

¶ 54    Hacker's IV file also contains a memorandum dated February 17, 1988, written by Walters and sent to defendant BSA's legal counsel as one of several documents relating to Hacker's arrest, in which Walters summarizes CAC's actions since their notification on February 2, 1988, that charges were pending against Hacker. Walters noted that, since the arrest, the "news media" had been contacting CAC regarding the case, and in particular, regarding the existence of a preexisting confidential file on Hacker from Indianapolis. Walters wrote:

"A zone meeting for budget requests of partner United Ways was held on Saturday, February 13. The question of the [investigation regarding Hacker] came up and the chartered partner concept was discussed with United Way, as well as not believing everything you read in the media, mainly that Mr. Hacker was not a Scoutmaster.

An investigation was conducted as to how Mr. Hacker was registered with the Chicago Area Council. It seems that Mr. Hacker was registered with no application as a multiple person in the 1984/85 charter year by saying that he was registered in another unit outside the council. That charter was forwarded to the National Office.

In checking unit registration with the Scout troop, which maintains impeccable unit records, no record of registration could be found for Mr. Hacker. An assumption would be that he 'beat the system' by registering as a 'multiple' which was not checked out. Mr. Hacker also used aliases of T. Hacker, Thomas J. Hacker, Tom Hacker, and Thomas T. Hacker."

¶ 55    Hacker's IV file shows that he was convicted in 1989 of multiple counts of aggravated sexual assault related to his abuse of Boy Scouts, and sentenced to a 100-year term of imprisonment. Hacker's convictions did not stem from his sexual abuse of plaintiff. Although plaintiff was not involved in Hacker's trial, he testified in his deposition that he had some knowledge that Hacker was being tried for sexually abusing boys:

"Q. Back in [']88 when you were interviewed, did you know that [Hacker] had been arrested at that time?

A. I had no knowledge of anything of the sort.

Q. Did you come to learn at some point in time that he had been jailed?

A. I believe, yes.

Q. When did you first learn that?

A. I don't recall the exact year.

Q. Did you know that he had been accused of crimes involving abusing minors?

A. I didn't read any particulars about it, but I heard through word of mouth that might have been.

* * *

Q. *** Did you see any of the newspaper articles or TV coverage of the Hacker case when it came out?

A. You know, I wouldn't want to be part of that because the first question I'd probably get asked is weren't you part of the Scouts?

- 14 -

Q. My question though is, do you remember that, the publicity about him being arrested for child molestation?

A. It was a little different. I remember some of it.

Q. Did you—Did you have a feeling of being safer now that he was under arrest?

A. No.

Q. Did you have any feeling about him being under arrest?

A. I'm glad it happened. I'm glad I didn't have to put him away.

Q. I'm sorry?

A. I'm glad I didn't have to put him away.

Q. What do you mean by that?

A. I'm glad I didn't take part in that. I don't want my name known.

Q. You mean you didn't want to take part in the trial that convicted him and put him in jail; is that what you mean by put him away?

A. I just wanted to forget it, and I wasn't actively trying to avoid it. I just wouldn't want to think about it, I wouldn't want to talk about it, and I wouldn't want to read articles or newspapers about it. It's not something I actively sought out.

Q. I understand, but it was something that was—that was there; it was out there in the press, correct?

A. I imagine it was. It was in the press quite a bit.

Q. Did you know that he was tried for these crimes?

A. I knew he was tried, yeah.

Q. Were you—Were you contacted by anybody, either the police or the State's Attorney's Office to testify at his trial?

A. No. I wonder why that was. I was in the Scouts. Nobody came forward and asked me.

Q. Did you go to the trial by any chance?

A. No.

Q. Did you know that he had been sentenced to a hundred years in prison?

A. No.

Q. Did you come to learn that at some point in time?

A. At some point.

Q. Do you remember when you learned that?

A. No. Much later."


¶ 56                    VIII. Plaintiff's Discovery of Perversion Files and Injuries

¶ 57        In 2009, six plaintiffs filed suit against defendant BSA in Oregon, alleging that the boys (then adults) had been molested by their scout leader. *Doe 1 v. Corporation. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints*, 280 P.3d 377, 380 (Or. 2012) (*en banc*). That lawsuit culminated in a 2010 trial for one of the plaintiffs. *Jack Doe 1*, 280 P.3d at 380. At the conclusion of phase one of that trial, the jury awarded compensatory damages in the amount of $1.4 million and punitive damages in the amount of $18.5 million against defendant BSA. *Doe 1*, 280 P.3d at 380. During the trial, the trial court admitted 1247

Perversion Files from 1965 to 1985 into evidence over defendant BSA's objections. *Jack Doe 1*, 280 P.3d at 380. Defendant BSA had previously produced those files in discovery and the files had been subject to a protective order. *Doe 1*, 280 P.3d at 380. At the close of trial, the plaintiffs moved to vacate the protective order, so that the Perversion Files could be released to the public. *Doe 1*, 280 P.3d at 380. Six media entities—the Associated Press, The Oregonian, Oregon Public Broadcasting, The New York Times, KGW, and Courthouse News Service—all moved to intervene and sought release of the IV files. *Doe 1*, 280 P.3d at 381 & n.3.

¶ 58     The trial court in *Doe 1* vacated its protective order and allowed the release of the files to the public in redacted form. *Doe 1*, 280 P.3d at 381. Defendant BSA filed a writ of *mandamus* in the Oregon Supreme Court requesting that the court reverse the trial court order that permitted release of the files. *Doe 1*, 280 P.3d at 382. The Oregon Supreme Court dismissed the writ, thereby allowing for release of 1247 files to the public in redacted form. *Doe 1*, 280 P.3d at 381. In October of 2012, the 1247 files became publicly available.[24] One of the many files was that of Thomas Hacker.

¶ 59     Plaintiff averred in his affidavit that neither plaintiff nor his parents learned of Hacker's history of molesting scouts until 2013. In 2013, plaintiff read a Chicago Tribune article regarding a lawsuit filed against Hacker, defendant BSA and defendant CAC. In his affidavit, plaintiff averred: "I then, for the first time, realized that Hacker was a known pedophile and that Boy Scouts of America knew he was a pedophile long before he abused me. It was at this time I sought legal counsel for the first time." Prior to 2013, plaintiff did not believe that defendants BSA or CAC had done anything wrong. He averred in his affidavit that he had no reason to suspect that either entity would have permitted Hacker to volunteer with his troop despite his long history of sexually abusing children.

¶ 60     Plaintiff further averred in his affidavit that he never told anyone about Hacker's abuse of him until 2013. He did not tell his parents, family, spouse, or friends about the abuse initially because he thought he would be in trouble if he did. He also chose to remain silent because he did not want any of those close to him to think differently of him or to know what was happening. In his affidavit, he stated that he had expressly denied that the abuse had occurred when asked by his parents. He did not tell his wife about the molestation until 2013.

¶ 61     Dr. John R. Conte, Ph.D., evaluated plaintiff on two separate occasions in 2015. As his affidavit and supporting documents indicate,[25] Dr. Conte is currently the Joshua Children's Foundation Distinguished Scholar on Child Sexual Abuse at the University of Washington School of Social Work, and he is presently serving as the editor of two peer-reviewed journals that publish a wide range of research on various aspects of interpersonal violence, including trauma. He has been evaluating, diagnosing, and treating abuse survivors for more than 30 years.

¶ 62     In his affidavit, Dr. Conte avers that plaintiff's life changed after learning of Hacker's IV file and reading it:

---

[24]The files are available online at http://crewjanci.com/resources/boy-scout-perversion-files/ (last visited July 20, 2016).

[25]The affidavit of John R. Conte, dated October 16, 2014, is attached as exhibit No. 40 to plaintiff's response to defendants' motion for summary judgment.

"After learning of Hacker's ineligible volunteer file, [plaintiff's] life changed. He was consumed with anger over the fact that he had been hurt by the defendants and they knew it, yet they did nothing over the years to approach him or help him. He had previously been successful in putting thoughts of abuse out of his mind, but he became consumed with both the initial sexual abuse and the betrayal and abuse committed by the Boy Scouts. He understood that the defendants could have prevented the abuse from happening. Thoughts of the abuse continually came up in his mind, and he began suffering recurring flashbacks of the abuse. At times these images popped into his head every two to three days and they caused him to become very angry.

[Plaintiff] is not self-aware, he has had a long history of suppressing negative thoughts, and he has had little interest in understanding his life in psychological terms. Before reading Mr. Hacker's ineligible volunteer file, it never occurred to [plaintiff] that he had suffered psychological injuries as a result of his abuse, let alone any injuries as a result of any wrongdoing by the defendants. [Plaintiff] has a long adult history of emotional and behavioral problems. He did not understand these symptoms as resulting from childhood sexual abuse but rather thought of them as the 'way he was.'

It was not until he learned about the contents of Mr. Hacker's ineligible volunteer file, and he became fixated on the abuse and the fault of the defendants in allowing the abuse to occur, that [plaintiff] realized that the manifestations of his psychological injuries, such as his anger and depression, were not natural and were in fact caused by the abuse he suffered as a child. [Plaintiff] has some of the features of post traumatic stress disorder ('PTSD') as a result of the sexual abuse by Mr. Hacker, but [plaintiff] was not aware that those features were related to the abuse by Mr. Hacker until after he learned of Mr. Hacker's ineligible volunteer file.

Prior to learning of Mr. Hacker's ineligible volunteer file, [plaintiff] had never told anyone about the abuse by Mr. Hacker, even though he had gone to marital counseling with his wife for issues in their marriage. Issues that are now clearly related to the sexual abuse he has not dealt with until learning about the betrayal of the Boy Scouts. It was not until after learning of Mr. Hacker's ineligible volunteer file that [plaintiff] disclosed the abuse to his wife.

Mr. Hacker's position as a scout leader played a considerable role in the process that Mr. Hacker used to groom and sexually abuse [plaintiff] because he had been taught that scout leaders were safe and trustworthy and his parents were insistent that he participate in scouting in order to learn good values. In addition to the psychological injuries that [plaintiff] suffered as a result of the sexual abuse by Mr. Hacker, it is my opinion that learning that the defendants could have protected him, and then covered-up their fault in allowing the abuse to happen, caused him separate psychological injuries, including: anxiety; depression; obsessive-compulsive symptoms (e.g. difficulty concentrating, his mind going blank); hostility and anger, some degree of paranoid ideation (e.g. feeling that others cannot be trusted) and somatization and interpersonal sensitivity and problems and relatedness; defensive avoidance; impaired self reference, reduced self awareness; dissociation; sexual concerns; negative cognitions of self criticism, self blame, helplessness, hopelessness, and preoccupation with danger; and affect control, including affect dysregulation (both affect skills deficits and affect instability); and tension reducing activities.

- 17 -

[Plaintiff] spent his adult life managing anger and rage, self-blame, embarrassment, and shame without understanding the origins of these in the sexual abuse he experienced by Mr. Hacker. It is my opinion that learning of the contents of Mr. Hacker's ineligible volunteer file caused [plaintiff] to begin to understand that he suffered psychological injuries as a result of the wrongful acts of the defendants, but he still has little understanding of how the abuse has changed his life and how it impacted his emotional life, romantic relationships, social relationships, and behavior. The quality of his life has been significantly made more negative by the abuse and the years that he did not understand the impact that the abuse had on his life but nonetheless suffered with anger, depression, feelings of isolation, intimacy difficulties and other emotional problems."

¶ 63                                              ANALYSIS

¶ 64    On this appeal, the trial court certified the following question for interlocutory review to this court under Illinois Supreme Court Rule 308 (eff. Jan. 1, 2015):

"Does the fraudulent-concealment statute of limitations permit a plaintiff to maintain an otherwise time-barred action for child sexual abuse when he testifies that he knew, before the action was time-barred, that he had sustained a physical injury from the abuser's conduct and that the abuser had been arrested and tried for similar crimes?"

¶ 65                                I. Illinois Supreme Court Rule 308

¶ 66    Illinois Supreme Court Rule 308 provides a remedy of permissive appeal from interlocutory orders where the trial court has deemed that they involve a question of law as to which there is substantial ground for difference of opinion and where an immediate appeal from the order may materially advance the ultimate termination of the litigation. Ill. S. Ct. R. 308 (eff. Jan. 1, 2015). Rule 308 is reserved for questions of law. See *Walker v. Carnival Cruise Lines, Inc.*, 383 Ill. App. 3d 129, 133 (2008). "[T]he rule was not intended to allow for an interlocutory appeal of merely an application of the law to the facts of a specific case." *Walker*, 383 Ill. App. 3d at 133.

¶ 67    We apply a *de novo* standard of review to legal questions presented in an interlocutory appeal brought pursuant to Rule 308. *Simmons v. Homatas*, 236 Ill. 2d 459, 466 (2010). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011). Generally, we are limited to answering the certified question and will not go beyond the question to address the appropriateness of the underlying order. *Cincinnati Insurance Co. v. Chapman*, 2012 IL App (1st) 111792, ¶ 21.

¶ 68    " 'Whether the injured person has become possessed of sufficient information concerning his or her injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved is usually a question of fact.' " *Wisniewski v. Diocese of Belleville*, 406 Ill. App. 3d 1119, 1165 (2011) (quoting *Pruitt v. Schultz*, 235 Ill. App. 3d 934, 936 (1992)). The *Wisniewski* court found that the effect of a plaintiff's knowledge about his abuse on the application of the fraudulent concealment statute was a question of fact. *Wisniewski*, 406 Ill. App. 3d at 1165. Defendants attempt to distinguish *Wisniewski*, but as

explained below, *Wisniewski* is controlling and the facts of *Wisniewski* are related starting in *infra* ¶ 86 of this opinion.

¶ 69     We are unwilling to hold, as a matter of law, that a plaintiff's knowledge that he sustained a physical injury and that his abuser has been arrested and tried for child sexual abuse is sufficient to put him on notice of every other potential claim against every other potentially liable party, especially where the plaintiff alleges that he did not discover those claims *because they were fraudulently concealed*.

¶ 70     Plaintiff argues that we should dismiss the present appeal because the certified question is a fact-based question. However, judicial economy counsels against dismissal. A central purpose of an interlocutory appeal pursuant to Rule 308 is to "materially advance the ultimate termination of the litigation." Ill. S. Ct. R. 308(a) (eff. Jan. 1, 2015). It is clear that the application of the fraudulent concealment statute to the facts of this case is an issue over which the parties and the trial court are not in full agreement. As such, clarifying this issue and addressing the trial court's question will advance the ultimate termination of the litigation. In contrast, dismissing the appeal at this stage would yield little clarification and allow for an unnecessary delay in litigation. Accordingly, we proceed to address the court's question.

¶ 71                              II. Statute of Limitations

¶ 72     A statute of limitations dictates the time within which a claimant must commence a lawsuit after his or her cause of action accrues. *DeLuna v. Burciaga*, 223 Ill. 2d 49, 61 (2006). In personal injury actions, a claimant's cause of action generally accrues at the time of the injury. *Golla v. General Motors Corp.*, 167 Ill. 2d 353, 360 (1995). However, under the judicially created discovery rule, a claimant's cause of action does not accrue until the claimant "knows or reasonably should know that he has been injured and that his injury was wrongfully caused." *Golla*, 167 Ill. 2d at 360-61.

¶ 73     By contrast, a statute of repose sets an outer time limit for filing a cause of action, regardless of when the action accrued. *DeLuna*, 223 Ill. 2d at 61. Thus, the discovery rule cannot save an action that has expired under a statute of repose. *Wisniewski*, 406 Ill. App. 3d at 1151 (citing *Goodman v. Harbor Market, Ltd.*, 278 Ill. App. 3d 684, 690-91 (1995)). Nevertheless, the fraudulent concealment statute may operate to revive a cause of action whether it is barred by a statute of limitations or a statute of repose. *DeLuna*, 223 Ill. 2d at 67-74; see also *Wisniewski*, 406 Ill. App. 3d at 1151.

¶ 74     The parties disagree on which statute of limitations applies to plaintiff's claim, although neither party has argued that a statute of repose applies. In their motion for summary judgment, the Boy Scout defendants argue that the applicable statute of limitations is the version of the two-year personal injury statute of limitations that was in effect at the time of plaintiff's abuse from 1983 to 1986 (Ill. Rev. Stat. 1983, ch. 110, ¶ 13-202).[26] Because plaintiff was a minor at the time of the abuse, the Boy Scout defendants argue that he had until two years after he turned 18 to file an action, pursuant to section 13-211 of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, ¶ 13-211).[27] Accordingly, the Boy Scout defendants maintain that

---

[26]The two-year statute of limitations for personal injury actions is now codified as 735 ILCS 5/13-202 (West 2014).

[27]The statute of limitations exception for minors and persons under disability is now codified as 735 ILCS 5/13-211 (West 2014).

plaintiff's action has been time-barred since August 16, 1993—the date of his twentieth birthday. Plaintiff, on the other hand, argues that the special statute of limitations for childhood sexual abuse claims—originally adopted as Ill. Rev. Stat. 1991, ch. 110, ¶ 13-202.2[28]—applies, although he does not specify which version applies or how it applies, except to argue that the 1991 version of the statute does not apply.

¶ 75        On January 1, 1991, the Illinois General Assembly adopted section 13-202.2 of the Code of Civil Procedure (Pub. Act 86-1346 (eff. Jan. 1, 1991)). When enacted in 1991, section 13-202.2 provided in pertinent part:

> "An action for damages for personal injury based on childhood sexual abuse must be commenced within 2 years of the date the person abused discovers or through the use of reasonable diligence should discover that the act of childhood sexual abuse occurred and that the injury was caused by the childhood sexual abuse, but in no event may an action for personal injury based on childhood sexual abuse be commenced more than 12 years after the date on which the abused attains the age of 18 years." Ill. Rev. Stat. 1991, ch. 110, ¶ 13-202.2(b).

Thus, the 1991 version of section 13-202.2 contained a two-year statute of limitations and a 12-year statute of repose. The 12-year statute of repose had the effect of preventing anyone over the age of 30 from bringing an action for personal injury based on childhood sexual abuse. *Doe A. v. Diocese of Dallas*, 234 Ill. 2d 393, 408 (2009).

¶ 76        Effective January 1, 1994, however, the legislature removed the 12-year statute of repose for childhood sexual abuse claims. After the 1994 amendment (Pub. Act 88-22 (eff. Jan. 1, 1994)), section 13-202.2(b) provided:

> "An action for damages for personal injury based on childhood sexual abuse must be commenced within 2 years of the date the person abused discovers or through the use of reasonable diligence should discover that the act of childhood sexual abuse occurred and that the injury was caused by the childhood sexual abuse." 735 ILCS 5/13-202.2(b) (West 1994).

As plaintiff correctly observes, no subsequent version of the statute has reinstated a statute of repose. Rather, each subsequent version, like the 1994 version, has imposed a time limit based on the claimant's discovery of the action.

¶ 77        Plaintiff was born on August 16, 1973. He was abused between 1983 and 1986, and he turned 18 years old on August 16, 1991, roughly eight months *after* the legislature adopted the childhood sexual abuse statute on January 1, 1991. The Boy Scout defendants agree that plaintiff's claim could not have accrued until he turned 18. Because his claim was not already time-barred when the childhood sexual abuse statute came into effect, and because his claim falls within the purview of the childhood sexual abuse statute, since the claim is "based on" sexual abuse, the statute applies to his claim. Furthermore, the 12-year statute of repose included in the 1991 version of the childhood sexual abuse statute would apply to plaintiff's claim only if he had turned 30 years old before 1994. *Diocese of Dallas*, 234 Ill. 2d at 410 ("Because the repose period was eliminated before it expired, there was never a time when it operated to insulate defendants from liability."). Because plaintiff turned 30 years old in 2003,

---

[28]The special statute of limitations for personal injury actions based on childhood sexual abuse is currently codified as 735 ILCS 5/13-202.2 (West 2014).

the 12-year statute of repose contained in the 1991 version of the statute does not apply to his claim.

¶ 78    Plaintiff alleges that he did not discover his cause of action against the Boy Scout defendants until 2013. Although he correctly observes that no statute of repose applies to his claim, plaintiff did not argue on this interlocutory appeal or on summary judgment that his claim is timely under any version of the childhood sexual abuse statute. Instead, he relied solely on the fraudulent concealment statute. Because plaintiff has not argued that his claim is timely under the childhood sexual abuse statute, and thus the Boy Scout defendants did not have occasion to respond to any such arguments, we decline to consider whether or not plaintiff's claim is actually timely under the childhood sexual abuse statute.[29]

¶ 79                                III. Fraudulent Concealment

¶ 80    The fraudulent concealment statute (735 ILCS 5/13-215 (West 2012)) provides:

> "If a person liable to an action fraudulently conceals the cause of such action from the knowledge of the person entitled thereto, the action may be commenced at any time within 5 years after the person entitled to bring the same discovers that he or she has such cause of action, and not afterwards."

Fraudulent concealment is not a cause of action in and of itself. *Cangemi v. Advocate South Suburban Hospital*, 364 Ill. App. 3d 446, 459 (2006). Rather, it is an exception to the limitations period imposed on other, underlying causes of action. *Cangemi*, 364 Ill. App. 3d at 459.

¶ 81    Generally, fraudulent concealment must consist of " 'affirmative acts or representations which are calculated to lull or induce a claimant into delaying filing of his claim or to prevent a claimant from discovering his claim.' " *Wisniewski*, 406 Ill. App. 3d at 1154 (quoting *Smith v. Cook County Hospital*, 164 Ill. App. 3d 857, 862 (1987)). " 'A plaintiff must plead and prove that the defendant made misrepresentations or performed acts which were known to be false, with the intent to deceive the plaintiff, and upon which the plaintiff detrimentally relied.' " *Wisniewski*, 406 Ill. App. 3d at 1154 (quoting *Orlak v. Loyola University Health System*, 228 Ill. 2d 1, 18 (2007)). Thus, as a general rule, mere silence on the part of the defendant and failure by the plaintiff to discover a cause of action is not enough to establish fraudulent concealment. *Wisniewski*, 406 Ill. App. 3d at 1154.

¶ 82    However, there is an exception to the rule that silence alone does not amount to fraudulent concealment if a fiduciary, trust, or other confidential relationship exists between the plaintiff and the defendant (alternatively called a "special relationship"). *Wisniewski*, 406 Ill. App. 3d at 1154 (citing *Chicago Park District v. Kenroy, Inc.*, 78 Ill. 2d 555, 561 (1980)). "[W]hen such a relationship exists, the person occupying the position of fiduciary or of confidence is under a duty to reveal the facts to the plaintiff, and his silence is as fraudulent as an actual affirmative

---

[29]All versions of the "Childhood Sexual Abuse" statute refer to an action for damages for personal injury "based on" childhood sexual abuse (735 ILCS 5/13-202.2(b) (West 2014) (originally codified at Ill. Rev. Stat. 1991, ch. 110, ¶ 13-202(b) (amended in 1994, 2003, 2011 (twice), 2013 and 2014))). All versions impose a limitations period that begins running upon a plaintiff's discovery of his or her action. Plaintiff's action appears to be an action for damages for personal injury "based on" childhood sexual abuse. Plaintiff claims that he did not discover his action until 2013 and that he filed suit shortly thereafter.

- 21 -

false representation or act." *Wisniewski*, 406 Ill. App. 3d at 1154 (citing *Chicago Park District*, 78 Ill. 2d at 562). "Silence by a person in a position of trust concerning the facts giving rise to a cause of action amounts to fraudulent concealment." *Wisniewski*, 406 Ill. App. 3d at 1155 (citing *Chicago Park District*, 78 Ill. 2d at 562).

¶ 83    As plaintiff observes, the Fifth District's recent decision in *Wisniewski* bears many similarities to the present case. In *Wisniewski*, the plaintiff, James Wisniewski, had been abused by a priest of the Diocese of Belleville (the Diocese), Raymond Kownacki, between 1973 and 1978. *Wisniewski*, 406 Ill. App. 3d at 1122. After the abuse stopped, Wisniewski was able to block it out of his mind and lead a healthy and successful life until 2002. *Wisniewski*, 406 Ill. App. 3d at 1143-44. However, when national news broke in early 2002 about a large-scale scandal involving priests in Boston, Massachusetts, who had molested children, Wisniewski began to experience severe psychological distress relating to Kownacki's molestation of him as a child. *Wisniewski*, 406 Ill. App. 3d at 1144-48. He wondered if Kownacki had molested other children, and what the Diocese had known about Kownacki before he had become Wisniewski's priest. *Wisniewski*, 406 Ill. App. 3d at 1144-46. Wisniewski filed a lawsuit in 2002 to find out what the Diocese had known about Kownacki's sexual misconduct. *Wisniewski*, 406 Ill. App. 3d at 1146.

¶ 84    Wisniewski asserted that his claim against the Diocese was timely because the Diocese had fraudulently concealed his cause of action. *Wisniewski*, 406 Ill. App. 3d at 1148. At trial, the evidence showed that the Diocese had known that Kownacki had a history of exploiting his authority as a priest to sexually abuse young people before his abuse of Wisniewski; that the Diocese knew that Kownacki sexually abused Wisniewski; and that the Diocese never disclosed any of this knowledge to Wisniewski at any time. *Wisniewski*, 406 Ill. App. 3d at 1123-27, 1161-62. The jury found that the fraudulent concealment statute operated to revive Wisniewski's claim against the Diocese because (1) a special relationship existed between the Diocese and Wisniewski; (2) the Diocese's failure to disclose their knowledge or fault to Wisniewski constituted fraudulent concealment, in light of this special relationship; and (3) the Diocese's fraudulent concealment had prevented Wisniewski from discovering his cause of action against the Diocese until 2002. *Wisniewski*, 406 Ill. App. 3d at 1160, 1162. The Diocese appealed, and our Fifth District of the Appellate Court upheld the jury's verdict and the trial court's judgment on that verdict. *Wisniewski*, 406 Ill. App. 3d at 1160, 1162. The Fifth District found that the above issues relating to the application of the fraudulent concealment statute had properly been submitted to the jury as questions of fact. *Wisniewski*, 406 Ill. App. 3d at 1160-62, 1168.

¶ 85    Based on *Wisniewski*, where a plaintiff alleges the existence of a special relationship, resolution of the issue of fraudulent concealment involves a three-part inquiry: (1) was there a special relationship between the parties; (2) did the defendant's acts or omissions amount to fraudulent concealment; and (3) did this fraudulent concealment prevent the plaintiff from discovering his claim. See *Wisniewski*, 406 Ill. App. 3d at 1160-62. In *Wisniewski*, each of these issues was a question of fact for the jury. *Wisniewski*, 406 Ill. App. 3d at 1160-62, 1168. In order to distinguish *Wisniewski*, and thus give a "no" answer to the certified question, we would have to find that the facts of the present case are so different that the issue of fraudulent concealment should be decided in the Boy Scouts' favor as a matter of law. See *Wisniewski*, 406 Ill. App. 3d at 1165. In other words, we would have to find that only one conclusion could

be drawn on the undisputed facts. *Pruitt*, 235 Ill. App. 3d at 936-37.

¶ 86                                    A. Special Relationship

¶ 87        A special relationship is a relationship that gives rise to a duty to disclose material facts concerning the existence of a cause of action. See *Wisniewski*, 406 Ill. App. 3d at 1157-61. It is well recognized that a formal fiduciary or confidential relationship, such as the attorney-client or doctor-patient relationship, gives rise to such a duty. *DeLuna v. Burciaga*, 223 Ill. 2d 49, 69, 73 (2006). However, such a relationship may also arise less formally in situations where a plaintiff places trust and confidence in a defendant, and the defendant thereby assumes a "position of influence or superiority" over the plaintiff. *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 500 (1996); see also *Wisniewski*, 406 Ill. App. 3d at 1160. Where, as here, a special relationship is not established between the parties as a matter of law, the issue must be decided by the factfinder, as long as the evidence supports reasonable disagreement on the issue. See *Wisniewski*, 406 Ill. App. 3d at 1160.

¶ 88        In *Wisniewski*, the appellate court upheld the jury's finding of a special relationship between the Diocese and Wisniewski, one of its parishioners. *Wisniewski*, 406 Ill. App. 3d 1160. The court summarized the evidence of a special relationship between Wisniewski and the Diocese as follows:

> "The jury heard evidence that the Diocese, its officers, its priests, and its parish in Salem, Illinois, played a central role in Wisniewski's life from the time his parents first moved to Salem when he was a young boy and throughout his childhood. The family was very active in church life, and Wisniewski and his siblings were taught to obey and believe everything the Diocese's bishops, monsignors, and priests said to them. Wisniewski was an active parishioner and an altar boy and was taught to trust and respect the Diocese and put his faith and trust in its agents and employees. He attended the Diocese's Catholic grade school for a number of years, worked around the parish, and expressed interest in becoming a Catholic priest.

> The agents and employees of the Diocese were held in high esteem in Wisniewski's family and were placed on a pedestal, and the Diocese itself fostered, promoted and encouraged this trusting relationship by urging its practitioners to trust their priests' 'knowledge, piety, prudence, experience and general character.' In fact, when the Diocese appointed Kownacki to the parish in Salem, the bishop, as the Diocese's CEO, 'command[ed] all, whom it may concern, to recognize [Kownacki] as such Pastor and grant [him] all necessary assistance.' The Diocese successfully garnered this trust with Wisniewski's parents and with Wisniewski, and it is this very trust that Kownacki exploited in order to sexually abuse Wisniewski for years." *Wisniewski*, 406 Ill. App. 3d at 1157.

Based on these facts, the appellate court found that the evidence "overwhelmingly established that Wisniewski placed his trust and confidence in the Diocese and that the Diocese not only accepted that trust and confidence but encouraged and promoted it." *Wisniewski*, 406 Ill. App. 3d at 1157. As such, the court upheld the jury's finding that a special relationship existed between Wisniewski and the Diocese. *Wisniewski*, 406 Ill. App. 3d at 1160.

¶ 89        In their motion for summary judgment, the Boy Scout defendants argued that, even if plaintiff thought he was reposing trust and confidence in defendants, he cannot establish that defendants accepted this trust and confidence. The Boy Scout defendants argued that

plaintiff's deposition did not establish the existence of a special relationship between the parties. The Boy Scout defendants emphasized the depth of the relationship between the Diocese and Wisniewski's family and claimed that plaintiff's deposition does not provide evidence of such a trusting relationship.

¶ 90　　In response, plaintiff argued that his relationship with defendants was "strikingly similar" to the relationship in *Wisniewski*. Plaintiff claimed that the Boy Scouts played an important role—as was their objective—in his early life; that the Boy Scouts taught plaintiff to obey and trust his adult leaders, as partially evidenced by their requirement that plaintiff obey scout law; that plaintiff and his parents trusted Hacker and all other leaders because defendants represented in the handbook, among other places, that such leaders were safe and could be trusted; and that defendants accepted plaintiff's trust, as evidenced by their promotion and requirement of an "intimate relationship" between scouts and scoutmasters and by their selective standards for choosing adult leaders. Plaintiff highlights the contradiction between the Boy Scout defendants' current efforts to de-emphasize the scout-scoutmaster bond with defendant BSA's arguments emphasizing the importance of the same relationship in *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000).[30]

¶ 91　　A reasonable jury could conclude that plaintiff reposed his trust in the Boy Scout defendants and that the Boy Scout defendants accepted plaintiff's trust. In his affidavit, plaintiff averred that, as a boy scout, he was loyal to his scoutmaster and the scouting way when he joined. He took the scout oath seriously and obeyed scout law to the best of his ability. He further averred that his parents trusted the Boy Scouts and Hacker; they would not have let plaintiff participate in activities that they did not believe were safe. A reasonable jury could find that the Boy Scout defendants accepted plaintiff's trust by (1) requiring that he take a scout oath, obey scout law, and be loyal to his adult leaders; (2) promulgating extensive policies, procedures, rules, and regulations, which focus in large part on maintaining safety for boy scouts; and (3) promoting an intimate relationship between scouts and the adult leaders whom they employ. A reasonable jury could find that by *requiring* loyalty from plaintiff, the Boy Scout defendants necessarily accepted plaintiff's trust.

¶ 92　　Furthermore, the relationship between plaintiff and the Boy Scout defendants resembles the relationship between Wisniewski and the Diocese in material respects. Defendant BSA, like a church, provides moral instruction to children. According to its website, defendant BSA offers a program for young people with the aim of building character, training them in responsible citizenship, and developing personal fitness.[31] In plaintiff's affidavit, he averred that he joined the Boy Scouts, in part, because his parents felt that it would instill positive values in him and provide for a safe, social activity. Any organization that accepts youth members, especially for purposes of moral guidance, is in a unique position of superiority and influence over those youths. Plaintiff's parents allowed plaintiff to spend time with defendant BSA—and thus, time alone with Hacker—because they wanted defendant BSA to have a positive moral influence on their son. Hacker exploited this position of moral influence over

---

[30] In *Dale*, the Supreme Court of the United States held that applying New Jersey's public accommodations law to require BSA to admit an open homosexual adult leader violated BSA's first amendment right of expressive association. *Dale*, 530 U.S. at 656. BSA's brief in *Dale* is attached as exhibit No. 35 to plaintiff's response to defendants' motion for summary judgment.

[31] http://www.scouting.org/About.aspx (last visited July 20, 2016).

plaintiff in the same way that Kownacki abused his power over Wisniewski. Based on these similarities, and the evidence discussed above, a factual issue exists as to whether or not plaintiff and the Boy Scout defendants were in a special relationship. As we explain more fully below, depending on the answer to this factual question, the fraudulent concealment statute may permit plaintiff to maintain the action in the instant case.

¶ 93                                    B. Defendants' Alleged Concealment

¶ 94     As we discussed above, a plaintiff alleging fraudulent concealment must generally show that a defendant engaged in affirmative acts amounting to fraudulent concealment. *Wisniewski*, 406 Ill. App. 3d at 1154. However, where there is a special relationship between the parties, a defendant's failure to disclose facts giving rise to a cause of action against it may constitute fraudulent concealment. *Wisniewski*, 406 Ill. App. 3d at 1154. For instance, in *Wisniewski*, the appellate court upheld the jury's finding that the Diocese's silence, after learning that Kownacki abused Wisniewski, constituted fraudulent concealment. *Wisniewski*, 406 Ill. App. 3d at 1161-62.

¶ 95     In the case at bar, the Boy Scout defendants do not dispute that they were silent regarding plaintiff's potential cause of action against them. Rather, they contend that no special relationship existed, and that their actions did not amount to fraudulent concealment in the absence of such a relationship. Plaintiff, on the other hand, argues that there was a special relationship. Alternatively, plaintiff argues that, even if the parties had not been in a special relationship, the Boy Scout defendants' affirmative acts—such as Ken Walters' statements to the press that defendant BSA performs background checks on adult leaders and that Hacker was not in the IV file system—amounted to fraudulent concealment.

¶ 96     If the Boy Scout defendants were in a special relationship with plaintiff, their silence could amount to fraudulent concealment. *Wisniewski*, 406 Ill. App. 3d at 1154. Because the Boy Scout defendants were admittedly silent regarding plaintiff's cause of action, an issue of fact remains as to whether or not they fraudulently concealed plaintiff's cause of action. If the finder of fact concludes that plaintiff and defendants were not in a special relationship, it will be asked to determine whether or not defendants' affirmative acts—such as Ken Walters' statements to the press—constituted fraudulent concealment.

¶ 97     However, there is one notable difference between the facts of *Wisniewski* and the facts of the present case regarding defendants' alleged concealment. In *Wisniewski*, there was evidence that the Diocese learned that Kownacki had molested Wisniewski. *Wisniewski*, 406 Ill. App. 3d at 1162. In upholding the jury's findings, the appellate court concluded that "the evidence was more than sufficient for a jury to find that the Diocese's continued silence *after learning that Wisniewski was abused* was the equivalent of an affirmative act of fraudulent concealment of Wisniewski's claim against it." (Emphasis added.) *Wisniewski*, 406 Ill. App. 3d at 1162. In contrast, in the case at bar, plaintiff does not argue that the Boy Scout defendants had positive knowledge that Hacker molested plaintiff in particular.

¶ 98     Nevertheless, this difference does not alter our conclusion on the issue. Hacker's IV file unequivocally shows that the Boy Scout defendants had knowledge, by 1988, that Hacker was a serial pedophile who had been registered as an adult leader with Troop 1600 from at least 1984 to 1987 when he resigned. For instance, in the February 12, 1988, correspondence from Paul Ernst to defendant BSA's legal counsel, quoted in the background section above, Ernst communicated that defendant BSA had learned that Hacker had sexually abused scouts as an

- 25 -

adult leader in the early 1970s; that Hacker registered with Troop 1600 in 1984 and 1985; and that Hacker had been indicted in 1988 for "25 counts of oral sex with youth, most of whom seemed to be scouts." Based on this evidence alone, a reasonable jury could find that the Boy Scout defendants had a duty to disclose their potential liability to all scouts who had been in Troop 1600 since 1984—which would include plaintiff—regardless of their specific knowledge about which scouts Hacker molested. Furthermore, plaintiff's allegation of fraudulent concealment is based in part on the Boy Scout defendants' wholesale concealment, until 2012, of their knowledge that pedophiles had been infiltrating Boy Scout troops and sexually abusing scouts consistently since the early twentieth century. Accordingly, we do not find *Wisniewski* distinguishable on the basis that the Boy Scout defendants, unlike the Diocese, may not have had specific knowledge of plaintiff's abuse.

¶ 99                           C. Plaintiff's Discovery of His Action

¶ 100    The final step in our analysis is to consider whether or not the Boy Scout defendants' alleged concealment prevented plaintiff from discovering his claim until late 2012. See *Wisniewski*, 406 Ill. App. 3d at 1162. With respect to actions for fraudulent concealment, a plaintiff must show either (1) that he or she could not have discovered the fraud sooner through the exercise of ordinary diligence or (2) that the trust or confidence that the plaintiff reposed in the defendant prevented the plaintiff from discovering the fraud any sooner. *Hagney v. Lopeman*, 147 Ill. 2d 458, 464-66 (1992); *In re Estate of Myers*, 120 Ill. App. 3d 726, 732 (1983); *In re Estate of Dykema*, 89 Ill. App. 3d 741, 744 (1980).

¶ 101    In *Wisniewski*, the appellate court concluded that the evidence was sufficient for the jury to find that Wisniewski had no reason to know or suspect any wrongdoing on the Diocese's part prior to 2002. *Wisniewski*, 406 Ill. App. 3d at 1163-64. Emphasizing the existence of a special relationship between the Diocese and Wisniewski, the court held that "Wisniewski had no reason to suspect that the Diocese betrayed his trust and confidence." *Wisniewski*, 406 Ill. App. 3d at 1165. In response to the Diocese's arguments that Wisniewski had sufficient information to place him on notice of his potential cause of action against it, the court found that Wisniewski had no duty, under the circumstances, to affirmatively investigate the Diocese's misconduct: "The evidence was sufficient for the jury to conclude that Wisniewski was under no obligation to search for wrongdoing by the Diocese when Kownacki was *engaged in activities that may be reasonably viewed as conduct that the Diocese would never tolerate*. The jury was entitled to find that Wisniewski was *not required to presume such unfaithfulness* on the part of the Diocese." (Emphases added.) *Wisniewski*, 406 Ill. App. 3d at 1169. Accordingly, the court upheld the jury's finding that the Diocese's concealment prevented Wisniewski from discovering his action until 2002. *Wisniewski*, 406 Ill. App. 3d at 1163-64.

¶ 102    Similarly, in the case at bar, a reasonable jury could conclude that plaintiff had no reason to know or suspect any wrongdoing on the part of the Boy Scout defendants until late 2012, when the IV files were first publicized. The record shows the following facts. Defendant BSA created an IV file on Hacker in 1970, when he was first banned for sexually abusing scouts. Nevertheless, Hacker was able to reregister and sexually abuse scouts in multiple positions at defendant BSA in the 1970s and 1980s. The IV files were kept extremely confidential until late 2012. Furthermore, Hacker's IV file shows that defendant BSA officials denied and even publicly disclaimed knowledge of Hacker's history of sexual abuse at the time of his arrest in 1988. Because plaintiff had no reason to know about the existence of the IV files before 2012,

and even had a legitimate basis for believing that defendant BSA had no knowledge of Hacker's history as a pedophile, a reasonable jury could find that plaintiff did not know, and had no reason, to suspect that the Boy Scout defendants had acted wrongfully until 2012.

¶ 103 Furthermore, given defendant BSA's representations that its program and adult leaders were safe and trustworthy, and given the relationship of trust that defendant BSA promoted, a reasonable jury could find that plaintiff had no duty to investigate the liability of defendants for his abuse. Child sexual abuse is an activity that may be reasonably viewed as conduct that defendant BSA, like the Diocese in *Wisniewski*, "would never tolerate." Accordingly, a reasonable jury could find that plaintiff was not required to "presume unfaithfulness" on the part of defendant BSA and investigate their knowledge about Hacker's history of sexual abuse.

¶ 104 The Boy Scout defendants argue that plaintiff cannot invoke the fraudulent concealment statute because he knew or should have known that he had a cause of action well before his claim expired in 1993. For the sake of argument, we will assume that plaintiff's claim, if not revived by the fraudulent concealment statute, would have expired in 1993. The Boy Scout defendants argue that plaintiff cannot rely on the fraudulent concealment statute because he knew, as early as 1988, that he had been abused, that he had sustained a physical injury from the abuse, and that the abuse was wrongful, as evidenced by the fact that he was interviewed in 1988 in connection with Hacker's arrest for sexually abusing boy scouts. For the sake of argument, we will assume that plaintiff knew all of these things by 1988. On the basis of these facts, the Boy Scout defendants attempt to distinguish *Wisniewski* and analogize instead to *Clay v. Kuhl*, 189 Ill. 2d 603 (2000), *Turner v. Nama*, 294 Ill. App. 3d 19 (1997), and *Real v. Kim*, 112 Ill. App. 3d 427 (1983). However, *Clay*, *Turner* and *Real* are readily distinguishable, and thus *Wisniewski* is controlling.

¶ 105 In *Clay*, the first case cited by the Boy Scout defendants, the plaintiff sued a religious order and a brother of the order, alleging that the brother had sexually abused her during her childhood from 1972 to 1979. *Clay*, 189 Ill. 2d at 605. The plaintiff alleged that the religious order had known of the brother's propensity for sexually abusing children but had negligently and recklessly failed to protect her against the abuse. *Clay*, 189 Ill. 2d at 605. The plaintiff experienced psychological problems subsequent to the abuse but did not draw a connection between these problems and the abuse until 1994. *Clay*, 189 Ill. 2d at 605-06. She filed her action in 1996. *Clay*, 189 Ill. 2d at 605. The defendants moved to dismiss the plaintiff's action on the grounds that it was time-barred. *Clay*, 189 Ill. 2d at 608. The plaintiff argued that her action was timely under the discovery rule, because she had not discovered her injury until 1994. *Clay*, 189 Ill. 2d at 608. The court held that the action was untimely under the discovery rule because the plaintiff had sufficient information about her injury and its cause to bring suit long before 1994. *Clay*, 189 Ill. 2d at 610. The court stressed that the plaintiff was always aware of the misconduct charged and did not allege that she had repressed memories of the abuse. *Clay*, 189 Ill. 2d at 610. The court also emphasized that there is no requirement that a plaintiff must know the full extent of his or her injuries before bringing suit. *Clay*, 189 Ill. 2d at 611.

¶ 106 The present case is distinguishable from *Clay* primarily because *Clay* was not a fraudulent concealment case. *Clay*, 189 Ill. 2d at 613. While the plaintiff in *Clay* attempted to analogize to fraudulent concealment cases, she was not alleging that the defendants fraudulently concealed her action. *Clay*, 189 Ill. 2d at 613. This is an important distinction because a plaintiff's burden under the common-law discovery rule is different than a plaintiff's burden when the plaintiff

alleges fraudulent concealment. Compare *Hagney*, 147 Ill. 2d at 464-66, with *Clay*, 189 Ill. 2d at 608. Under the discovery rule, a party's cause of action accrues "when the party knows or reasonably should know of an injury and that the injury was wrongfully caused." *Clay*, 189 Ill. 2d at 608. By contrast, a party alleging fraudulent concealment may argue that the trust or confidence reposed in the defendant prevented timely discovery of the action. *Hagney*, 147 Ill. 2d at 464-66. Because this issue is unique to fraudulent concealment cases, the Boy Scout defendants' arguments based on cases that do not involve allegations of fraudulent concealment are inapposite.

¶ 107    In *Turner*, the second case cited by the Boy Scout defendants, the decedent claimed that she was under the defendant's medical care from 1982 to 1993. *Turner*, 294 Ill. App. 3d at 23. She alleged that in 1990, the defendant performed tests on her that indicated that she had carcinoma, although she was not informed of these test results until 1993, after another doctor diagnosed her with cancer. *Turner*, 294 Ill. App. 3d at 22-23. After this later diagnosis, the defendant told the decedent that he had sent her the test results in 1990, although the decedent claimed she never received them. *Turner*, 294 Ill. App. 3d at 22-23. At that point, in 1993, there were still eight months left before the decedent's medical malpractice claim was set to expire in 1994. *Turner*, 294 Ill. App. 3d at 28. The decedent died in 1995. *Turner*, 294 Ill. App. 3d at 23. The plaintiff sued the defendant in 1995, after the decedent's death. *Turner*, 294 Ill. App. 3d at 22-23. The plaintiff claimed that if the doctor had sent the letter, then he was negligent in failing to confirm that the decedent had received the letter because, as a doctor, he was under a duty to ensure that his patient was informed of her cancer diagnosis. *Turner*, 294 Ill. App. 3d at 23. Alternatively, the plaintiff claimed that if the defendant had not sent the letter, then he had fraudulently concealed his negligence by telling the decedent that he had sent it. *Turner*, 294 Ill. App. 3d at 23-24.

¶ 108    The appellate court affirmed dismissal of the plaintiff's complaint. *Turner*, 294 Ill. App. 3d at 34. The court reasoned that, as of the date of the defendant's 1993 statement that he had sent the results in 1990, the decedent knew or should have known that she had a claim for medical malpractice against him. *Turner*, 294 Ill. App. 3d at 27. Based on the defendant's statement, the plaintiff should have known that he had either been negligent in failing to confirm that she had received the test results or that he had fraudulently concealed his negligence by falsely claiming that he sent the letter. *Turner*, 294 Ill. App. 3d at 27. In any event, the decedent reasonably should have known in 1993—with eight months left before her claim was set to expire in 1994—that she had a cause of action against the defendant. *Turner*, 294 Ill. App. 3d at 27.

¶ 109    *Turner* is distinguishable from the present case. In *Turner*, the decedent had all of the information pertaining to her cause of action against the doctor in 1993, before her claim expired. The plaintiff's alternative theories regarding the defendant's liability were both based on information that the decedent was aware during the limitations period. By contrast, in the present case, plaintiff bases his cause of action on his discovery of the IV files, which he indisputably could not have discovered until late 2012. The Boy Scout defendants argue that plaintiff should have discovered his cause of action well before his claim allegedly expired in 1993, based on his knowledge that he was abused, that he sustained a physical injury, and that Hacker was tried for sexually abusing other boy scouts. However, the Boy Scout defendants do not explain how this knowledge regarding *Hacker's* wrongful conduct somehow placed plaintiff on notice of *defendants'* negligence, especially when plaintiff alleges that he did not

discover this cause of action because the Boy Scout defendants were fraudulently concealing the facts giving rise to it. Accordingly, we do not find *Turner* controlling here.

¶ 110     In *Real*, the third case cited by the Boy Scout defendants, the plaintiff sued the defendant for medical malpractice, alleging that the defendant had negligently misdiagnosed his decedent in 1976. *Real*, 112 Ill. App. 3d at 435. In 1979, the decedent was diagnosed with brain cancer. *Real*, 112 Ill. App. 3d at 435. The limitations period for the medical malpractice against the defendant expired in 1980, 10 months after the decedent's cancer diagnosis. *Real*, 112 Ill. App. 3d at 435-36. The plaintiff filed suit against the defendant in 1981, alleging that the defendant was estopped from asserting the statute of limitations as a defense because any delay in filing suit was caused by defendant's negligent misdiagnosis. *Real*, 112 Ill. App. 3d at 430. The court held that the plaintiff's claim was time-barred because, at the time of the correct diagnosis, the decedent knew or should have known that he was misdiagnosed in 1976. *Real*, 112 Ill. App. 3d at 435-36. As a result, he had the burden of investigating whether or not he had a claim for medical malpractice with ample time (10 months) left in the limitations period. *Real*, 112 Ill. App. 3d at 435-36. Accordingly, the court held that defendant was not estopped from asserting the statute of limitations defense. *Real*, 112 Ill. App. 3d at 436.

¶ 111     The Boy Scout defendants' reliance on *Real* is not persuasive for the same reasons that *Clay* and *Turner* are distinguishable. First, like the plaintiff in *Clay*, the plaintiff in *Real* did not allege that the defendant fraudulently concealed his claim, as the court made clear. *Real*, 112 Ill. App. 3d at 436. Accordingly, *Real* does not impact our fraudulent concealment analysis. Second, the plaintiff in *Real*, like the plaintiff in *Turner*, was on notice of all facts relevant to his cause of action within the limitations period. Thus, *Clay*, *Turner,* and *Real*—cited by the Boy Scout defendants—do not alter our conclusion that summary judgment was properly denied.

¶ 112     Furthermore, the Boy Scout defendants' attempts to distinguish *Wisniewski* are unconvincing. The Boy Scout defendants highlight two differences between *Wisniewski* and the present case. First, they observe that Wisniewski did not believe that Kownacki's abuse of him was wrongful, whereas plaintiff knew during the limitations period that Hacker's abuse of him was wrongful. Next, they observe that Wisniewski suffered no injury from the abuse until 2002, whereas plaintiff suffered a physical injury and emotional distress from the abuse during the period of abuse. Neither of these differences warrant distinguishing *Wisniewski*.

¶ 113     First, defendants' arguments are not persuasive that plaintiff knew during the limitations period that his abuse was "wrongful." Defendants argue that plaintiff's knowledge that Hacker was tried for sexually abusing boy scouts is evidence of plaintiff's knowledge that Hacker's abuse of him was "wrongful." As noted above, a plaintiff's knowledge of abuse and his knowledge that it was wrongful can trigger the statute of limitations under the discovery rule. *Clay*, 189 Ill. 2d at 608. However, the principle from *Clay* does not unequivocally apply when a plaintiff is alleging that the defendant fraudulently concealed the wrongfulness of its own actions. See *Hagney*, 147 Ill. 2d at 464-66. Here, the only wrongfulness at issue is that of the Boy Scout defendants, whom plaintiff accuses of concealing their culpability. Since a factual issue exists as to whether plaintiff's trust and confidence in the Boy Scout defendants prevented him from discovering that they had acted wrongfully, plaintiff's knowledge that Hacker's abuse of him was wrongful is insufficient to distinguish *Wisniewski*.

¶ 114     Second, *Wisniewski* is not distinguishable on the grounds that plaintiff, unlike Wisniewski, suffered physical and emotional injuries as a result of the abuse before his claim expired. The

Boy Scout defendants correctly observe that plaintiff bled at least once after being anally raped by Hacker and that he experienced emotional distress during the period of Hacker's molestation. However, plaintiff clearly had no desire to initiate legal proceedings against Hacker based on these injuries alone. Plaintiff's decision to forego litigation against Hacker does not preclude him from bringing suit against the Boy Scout defendants for negligence. Furthermore, the evidence shows that plaintiff suffered new and distinct injuries in 2013. In his affidavit, Dr. John R. Conte, Ph.D., avers that plaintiff suffered new and distinct psychological injuries arising from his discovery of the Boy Scout defendants' allegedly wrongful conduct in 2013. In this sense, plaintiff's injuries are similar to Wisniewski's, which did not arise until he first entertained the possibility that the Diocese had allowed his abuse to happen in 2002. Because the injuries for which plaintiff is suing far exceed the injuries that plaintiff was aware of during the limitations period, *Wisniewski* is not distinguishable on that basis.

¶ 115 In sum, we are not persuaded by the case law that defendants rely on, or their attempts to distinguish *Wisniewski*. As such, we continue to conclude that a factual issue remains as to whether or not defendants' alleged concealment prevented plaintiff from discovering his cause of action against them until late 2012 and, depending on the answer to this question, the fraudulent concealment statute may permit his action.

¶ 116                                                    CONCLUSION

¶ 117 On this interlocutory appeal, the trial court certified the following question to this court:

"Does the fraudulent-concealment statute of limitations permit a plaintiff to maintain an otherwise time-barred action for child sexual abuse when he testifies that he knew, before the action was time-barred, that he had sustained a physical injury from the abuser's conduct and that the abuser had been arrested and tried for similar crimes?"

¶ 118 As noted above, the word "permit" means "to allow" or "to make something possible." Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/permit (last visited Sept. 29, 2016). Thus, the question asks to decide whether a suit is possible under the stated conditions.

¶ 119 In sum, a "no" answer to the above question would mean that, as a matter of law, a plaintiff's knowledge that he had sustained a physical injury and that his abuser was arrested and tried for similar crimes would bar a plaintiff from invoking the fraudulent concealment statute under *all* circumstances and against *any* party who could be potentially liable. We cannot agree with this proposition.

¶ 120 As a result, and for the foregoing reasons, we answer "yes" to the certified question.

¶ 121 Certified question answered.

¶ 122 JUSTICE LAMPKIN, dissenting.

¶ 123 I respectfully dissent. I would decline to address the certified question. As often happens, the certified question is framed as a question of law, but the ultimate disposition depends on the resolution of a host of factual predicates. *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 469 (1998); see also *Morrissey v. City of Chicago*, 334 Ill. App. 3d 251, 258 (2002). Thus, any answer this court provides is an advisory opinion (*Dowd & Dowd*, 181 Ill. 2d at 469), and

Illinois courts do not issue advisory opinions to guide future litigation (*Golden Rule Insurance Co. v. Schwartz*, 203 Ill. 2d 456, 469 (2003)). This case is no exception.

¶ 124 Illinois Supreme Court Rule 308, which governs interlocutory appeals, is an exception to the general rule that only final orders from a court are subject to appellate review. *Morrissey*, 334 Ill. App. 3d at 257. Rule 308 was intended to be used sparingly and limited to those special circumstances set forth in the rule; it was never intended to serve as a vehicle to appeal interlocutory orders involving little more than an application of the law to the facts of a specific case. *Thomas v. Page*, 361 Ill. App. 3d 484, 494 (2005).

¶ 125 The circuit court's order denying summary judgment was based on the existence of questions of fact, and the certified question, as phrased, involves factual considerations for the jury to decide. After reviewing the briefs and record in this case, I do not believe this certified question presents a question of law. Therefore, I would vacate our order allowing this interlocutory appeal and dismiss this appeal.